**Supreme Court**

No. 2012-83-C.A.
(P1/10-1705A)

|  |  |
|---|---|
| State | : |
| v. | : |
| Darnell Hie. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                          :

v.                            :

Darnell Hie.                    :


Present:  Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The defendant, Darnell Hie, appeals to this Court from a November 17, 2011 judgment of conviction after a jury found him guilty of two counts of second-degree child molestation sexual assault in violation of G.L. 1956 § 11-37-8.3.  On appeal, the defendant contends that the trial justice erred in refusing to declare a mistrial and in denying his motion for a new trial.  This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After a close review of the record and careful consideration of the parties' arguments (both written and oral), we are satisfied that cause has not been shown and that this appeal may be decided at this time.

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction and its denial of defendant's motion for a new trial.

- 1 -

# I

## Facts and Travel

The complaining witness, Jessica,[1] was born on November 12, 1994 and was seventeen years old at the time of trial, in November of 2011. According to her testimony, on November 2, 2009, at the age fourteen, Jessica disclosed to her cousin Sarah (who was also her classmate) that defendant, Jessica's stepfather, had sexually molested her multiple times when she was in the third grade. It was Jessica's testimony that, immediately after listening to that disclosure, Sarah encouraged Jessica to share this information with Yvonne, Jessica's mother; Jessica added that she agreed and used her cellular phone to send a text message to her mother, asking her to come to her school because she needed to talk to her. Jessica stated that Yvonne arrived at the school, and there, in the principal's office, she revealed to her mother that defendant had sexually molested her.

On May 21, 2010, a Providence County grand jury indicted defendant on four counts of first-degree child molestation sexual assault in violation of § 11-37-8.1 and ten counts of second-degree child molestation sexual assault in violation of § 11-37-8.3. The charged offenses were alleged to have occurred between September of 2002 and June of 2003. Counts Eight and Fourteen alleged "Penile to Vaginal Penetration;" Counts Five and Eleven alleged "Penile to Anal Penetration;" Counts One, Four, Seven, Ten, and Thirteen alleged "Hand to Vagina;" and Counts Two, Three, Six, Nine, and Twelve alleged "Hand to Breast."

In due course, a jury trial was held over four days in November of 2011. We summarize below the salient aspects of what transpired at that trial.

---

[1] In order to respect the privacy of the complaining witness and that of her family, we have used pseudonyms in referring to the complaining witness ("Jessica"), her mother ("Yvonne"), her older sister ("Adriana"), her half-sister ("Daria"), and her cousin ("Sarah"). For the same reason, we have omitted their surnames. In doing so, we intend no disrespect.

**A**

**The Testimony at Trial**

**1.      The Testimony of the Complaining Witness**

Jessica testified that, at the time of the assaults, she lived in an apartment on Charles Street in Providence with her mother, her older sister, Adriana, her less than one-year-old half-sister, Daria, and defendant, whom she had known, "[her] whole life." She stated that she shared a bedroom with her sisters and that her mother and defendant slept in another bedroom. At trial, Jessica described five separate incidents that she testified took place over a ten-to-twelve week period, during which defendant came into her room during the night, assaulted her, and left.

Jessica testified that during the first incident (Counts One & Two), defendant "came into [her] room and he laid under the covers with [her] and touched [her] under and over [her] pajamas." She stated that she was awake during this incident, but that she kept her eyes closed because "[she] was scared." She further stated that she assumed defendant was the one who touched her because "[she] felt his hands touching [her] body" and "[h]is hands were rough."

Jessica testified that the second incident (Counts Three, Four & Five) took place approximately two weeks later. She stated that she was sleeping in her bed, lying on her stomach, and awoke to the touch of defendant's hands on her breast and vagina "over and under [her] pajamas." She stated that she opened her eyes this time and, "[t]hrough the corner of [her] eye," saw defendant on top of her. She testified: "At first he was touching me and then he inserted his penis in my rear end."

It was Jessica's testimony that the third incident (Counts Six, Seven & Eight) took place approximately two weeks after the second incident. She stated that she was sleeping in her bed, this time on her back, and awoke to the touch of defendant's hands on her breast and vagina

"over and under [her] pajamas." She stated that she opened her eyes and saw defendant on top of her. This time, she further stated, "[defendant] actually inserted his penis inside my vagina."

The fourth incident (Counts Nine, Ten & Eleven), Jessica testified, was similar to the second incident. She stated that she was sleeping in her bed, lying on her stomach, and awoke to the touch of defendant's "rough" hands on her breast and vagina "over and under [her] pajamas." She further stated that, when she opened her eyes, defendant was "on top of [her] with his hands underneath [her] from behind." Then, Jessica stated, defendant penetrated her anally.

During the fifth incident (Counts Twelve, Thirteen & Fourteen) concerning which Jessica testified, she was sleeping in her bed, on her back, and awoke to the touch of defendant's hands on her breast and vagina "over and under [her] pajamas." Then, she stated, defendant "insert[ed] his penis inside my vagina."

Jessica testified that she did not tell anyone about the incidents when they occurred because "[defendant] was still in the house" and "[she] didn't feel safe." On cross-examination, Jessica testified that defendant did not threaten her and never said anything to her during the incidents that she had described. She had testified on direct examination, however, that "[w]hen [she] would see [defendant] around the house," "[h]e would give like little side smiles here and there."

In her testimony, Jessica estimated that each incident lasted "[a]bout 20 to 30 minutes." She stated that each of the incidents occurred while her sisters, Adriana and Daria, were sleeping in the same room. She further stated that she did not "call[] out" to Adriana or to her mother and never told defendant to "stop" or "get away." When Jessica was asked by defense counsel whether she had any type of discharge or blood after the second or third incident, she replied "[n]ot that I know of."

Jessica acknowledged in her testimony that six to seven years had passed between defendant's assaults and her reporting about them. During this time, she stated, her mother and defendant "had an okay relationship" but "[t]hey had their ups and downs." She further stated that, although her mother and defendant "broke up and [defendant] left the house for good" in 2007, her mother and defendant continued to see each other. Jessica testified that only when she knew defendant "was gone for good," after her mother filed for divorce, did she feel "safe enough to talk about it."

Jessica testified that, after she revealed to her mother (at the office of the principal of her school) that defendant had "raped" her, she refused to describe the assaults in any detail to her. Jessica stated that she did not want to tell her mother about the details because she "was scared and because [her mother] has kids with [defendant]" and "[b]ecause [she] knew it would hurt her [mother] more."

## 2. The Testimony of the Mother of the Complaining Witness

Jessica's mother, Yvonne, testified that she had known defendant since 1994, when she was twenty-four years old; she added that she married him in 1999. Yvonne further testified that, at the time of the assaults, she lived with defendant in an apartment on Charles Street in Providence along with her daughters—Adriana, Jessica, and Daria. Yvonne stated that, since Daria was one month old, she "would * * * spend the night in [Adriana]'s bed a lot of the time."

Yvonne testified that her daughter Adriana told her one morning that "she awoke in the middle of the night and saw [defendant] * * * in their bedroom * * * looking out the window." Yvonne further testified that, when she asked defendant to explain what he had done in the girls' room, "[h]e said he had heard something [and he] wanted to make sure the windows were locked." Yvonne stated that she found defendant's behavior "odd" and that it "kind of upset

[her] a little." It was Yvonne's testimony that, after that incident, she installed a lock on Adriana and Jessica's door; she described the lock as being "one of those that you buy at any hardware store and screw it into the wall." She stated that she wanted to put a lock on their door so that "they can lock their door and feel safe at night." Yvonne further stated that she asked her daughters to lock their bedroom door at night.

It was Yvonne's testimony that defendant "didn't understand why there was a lock on the door" and "would say things like what if there was a fire, or what if something happens, how are we going to get to them." Yvonne testified that, a week or two after she installed the lock, defendant "pushed the door in and broke the lock." She summarized as follows defendant's explanation as to why he broke the lock:

> "[He] stated that he heard some noise in their room. He thought somebody was in their bedroom, and I had my ear to the door. I didn't hear anything. He kept insisting somebody was there. He got mad and pushed the door, forced the door open, kind of broke the piece of the wood so we couldn't put the lock back on."

Yvonne stated that, when defendant came through the door, no one other than Adriana and Jessica was in the room; she added that they were in bed and that they "jumped up, scared." It was further her testimony that there was never another adult male in the house overnight and that, during the time period in which the assaults occurred, Jessica "seemed nervous all the time."

On cross-examination, Yvonne testified that the first time she heard that defendant was assaulting Jessica was in 2009, when Jessica told her at her school that defendant had "raped [her]." Yvonne added that Jessica never disclosed any further details of what happened to her and that, even at the time of trial, she still had "no idea of what actually happened other than that [Jessica] told [her] that she was raped by [defendant]." It was her testimony that she "explained

to [Jessica] what rape was" and Jessica confirmed that she had been raped, stating, "'Yes, he raped me.'" Yvonne reiterated that her daughter had never spoken to her about any details.

On redirect examination, the prosecutor and Yvonne engaged in the following exchange:

> "[**Prosecutor**]: You have been asked a number of different questions a number of different ways about the fact that your daughter has not explained to you what she meant by rape; is that right?
>
> "[**Yvonne**]: Yes.
>
> "[**Prosecutor**]: She has never told her mother that someone put his penis in her anus; is that right?
>
> "[**Yvonne**]: No.
>
> "[**Prosecutor**]: She has never told you that someone put his penis in her vagina; is that right?"

At that point, defense counsel objected, but Yvonne proceeded to answer in the negative. A sidebar conference, out of the hearing of the jury, then took place; defense counsel addressed the trial justice as follows: "[T]he witness is totally broken down on the stand. She is crying uncontrollably. It's through no question that I asked her. It's through the prosecutor's redirect." Defense counsel asked the trial justice to pass the case (i.e., declare a mistrial), arguing that the prosecutor "went after" Yvonne "as a total adverse witness against the rules of redirect;" he added that "[t]o have her breakdown [sic] to the point where the jury can feel nothing but sympathy, I think it's prejudicial to my client." The trial justice characterized the prosecutor's questioning as a "very grave error," "totally inappropriate," and "totally improper." He further chastised the prosecutor at sidebar as follows:

> "Why in the world did you take it upon yourself to tell her what her own daughter has never told her after all of these years when the witness's answers have been consistent on both direct and cross examination that the daughter never told her?

"* * *

"This case rises and falls on the witness's statement, [Jessica's] statement, not what her mother didn't know that, you, with great vehemen[ce] told her that she didn't know, and I think it was very inappropriate that you took it upon yourself to tell her what she didn't know when it wasn't necessary. It wasn't necessary to prove your case and put this woman through the distress that she is now going through."

Despite his criticism at sidebar of the challenged questions by the prosecutor, the trial justice

nonetheless decided not to pass the case; and he denied defense counsel's motion to that effect.

Instead, the trial justice provided a curative instruction to the jury as follows:

"Ladies and gentlemen, that line of questioning engaged in by the prosecutor I consider to be inappropriate to this witness. First of all, the witness answered consistently in both direct, cross and redirect that she was never told by her daughter what the actual alleged acts of misconduct were.

"I think it's unfortunate that the prosecution chose to reveal these facts to this woman at this time. It really doesn't add anything to this case other than to the discomfort of this woman.

"Now, one of the dangers of her reaction to this is the aspect of sympathy which may be visited upon you by her sudden surprise and reaction to this news. It has nothing to do with the quantum of proof. The case rises or falls so far as I can see in this case at this point on the testimony of the young complaining witness, not on this mother or her reaction to the news of the details allegedly experienced by her minor daughter. So I'm going to instruct you not to have any sympathy for this woman because of this revelation by the prosecution which apparently she has never heard before."

The following exchange between the trial justice and Yvonne then took place:

"[**Trial Justice**]: Is that correct, Miss, you had no idea the nature of these acts?

"[**Yvonne**]: No.

"[**Trial Justice**]: Despite your repeated questions of her over time?

"[**Yvonne**]: Yes.

"[**Trial Justice**]: You never heard [sic] a police report?

"[**Yvonne**]: No."

The trial justice then further addressed the jury in the following words:

> "Okay. So her reaction has got nothing to do with this other than her own unfortunate discovery of the nature of these allegations. It doesn't prove the allegations. Understand what I'm saying? And I think that line of questioning was inappropriate. I'm not going to do anything other than caution you not to allow this to enter into your deliberations with regard to overt sympathy. You may take this witness's testimony and weigh it and sift as you would anyone else, but you would give no great weight or allow your deliberations to be swayed by the emotion that she has shown by this apparent and recent discovery."

At that point the questioning of Yvonne ceased, and Jessica's sister Adriana was called to the stand.

### 3. The Testimony of the Complaining Witness's Sister

Adriana, Jessica's older sister, was next called by the prosecution; she stated that she remembered defendant being in the bedroom which she shared with Jessica at the apartment on Charles Street during the night on two occasions. It was her testimony that, on one of those occasions (which she stated that she told her mother about), defendant was "looking out the window, the bedroom window." It was further her testimony that, on the other occasion, she "woke up" and saw defendant "getting out up from [Jessica's] bed;" she added that she pretended to be asleep and that defendant walked over, "sat on the end of [her] bed and then he left the room." Adriana testified that she did not tell her mother about the second incident.

## B

### The Jury Instructions, the Deliberations and the Verdict

After Adriana's testimony, the prosecution rested, and defendant (after unsuccessfully moving for a judgment of acquittal) likewise rested without calling any witnesses. In the course of giving his final instructions to the jury, the trial justice stated:

> "With regard to the sympathy factor, let me reiterate my comments about any undue sympathy which may have been invoked in you by the emotional response of [Yvonne] on the stand the other day. Sympathy, compassion, hatred, bias, any of the human emotions that we all have and that we all experience have no place in your deliberations."

After a day of deliberating the jury sent a note to the trial justice stating that it had reached a consensus on "12 of the 14 counts but [was] struggling to come up to a consensus on the other two." After receiving that note from the jury, the trial justice repeated his instructions concerning the issues to which the jury had pointed. That same day, the jury returned a verdict of guilty on two counts of second-degree sexual assault, both of which arose from the first incident about which Jessica testified. Specifically, defendant was found guilty on Count One and Count Two which alleged "Hand to Vagina" and "Hand to Breast" respectively. The jury returned a not guilty verdict on the remaining twelve counts. In due course, the trial justice sentenced defendant on each of the two counts to twenty-five years imprisonment, with eight years to serve and seventeen years suspended, with probation.

## C

### Motion for a New Trial

The defendant moved for a new trial, which motion was heard on December 2, 2011. The defendant argued that the jury's verdict was "inconsistent" with the evidence presented at trial. It was his contention that there was "really * * * nothing different between" Jessica's

testimony about the first incident of alleged sexual molestation and her testimony about the other incidents. Accordingly, defendant argued that, if the jury found Jessica to be a credible witness, it should have found him guilty on "all counts" and if it did not find her to be a credible witness it should have "acquitted him" on all counts. The defendant also pointed out that the first incident had the least evidentiary support since Jessica testified that she had "her eyes closed" and knew defendant only by his "rough hands." The defendant characterized Jessica's testimony as "robotic;" he added that her description of what had occurred was "done basically without any type of emotion[,] * * * almost in a script * * * ."

The trial justice denied defendant's motion. He found Jessica's testimony to be "unemotional" but nevertheless "credible." With respect to Yvonne, the trial justice stated that he found her to be "extremely credible particularly after she was made aware" of the specific allegations against defendant. The trial justice expressed his "surprise" that the jury convicted on only two of fourteen counts, and he found the verdict to be inconsistent. However, he declined to "disturb the finding of guilty on the first two counts." The trial justice stated that the jury "understood the charge, and took their time." He further stated that there could have been "some compromise" among the jurors or that the jury may not have believed that a "child of tender years" could have experienced the type of penetration Jessica described without "cry[ing] out." The trial justice stated that a "reasonable inference[]" could be drawn from Jessica's testimony that the perpetrator of the first incident of sexual assault (Counts One & Two) was defendant because he was the only adult male in the household.

- 11 -

## II

## Issues on Appeal

On appeal, defendant contends: (1) that the trial justice erred in failing to grant his motion to pass the case subsequent to the prosecutor's questioning on redirect examination of Yvonne with respect to the details of the assaults that defendant allegedly committed against Jessica (which questioning the trial justice characterized as "totally improper"); and (2) that, in denying defendant's motion for a new trial, the trial justice overlooked and misconceived material evidence and inappropriately relied on Yvonne's emotional response to the prosecutor's questioning on redirect examination, which he had instructed the jury not to consider.

## III

## Analysis

## A

## The Motion to Pass the Case

## 1. Standard of Review

It has been our consistent practice to review the decision of a trial justice on a motion to pass[2] a case for abuse of discretion. State v. Clements, 83 A.3d 553, 564 (R.I. 2014); see State v. Hernandez, 641 A.2d 62, 69 (R.I. 1994) ("The decision to declare a mistrial is within the sound discretion of a trial justice."); see also State v. McManus, 941 A.2d 222, 234 (R.I. 2008); State v. Figueroa, 673 A.2d 1084, 1091 (R.I. 1996). We apply the abuse of discretion standard because "[t]he trial justice enjoys a ringside seat at the trial and therefore is in the best posture to determine whether a witness's inappropriate remark [or action] has so inflamed the jurors that

---

[2]     "[A] motion to pass a case is viewed for all intents and purposes as identical to a motion for a mistrial." State v. McManus, 941 A.2d 222, 234 (R.I. 2008) (internal quotation marks omitted); see also State v. Disla, 874 A.2d 190, 198 (R.I. 2005).

they no longer would be able to decide the case based on a calm and dispassionate evaluation of the evidence." State v. Disla, 874 A.2d 190, 198 (R.I. 2005) (internal quotation marks omitted); see also State v. Mendoza, 889 A.2d 153, 158 (R.I. 2005). For that reason, the decision of a trial justice to deny a party's motion to pass the case "will be given great weight, and we will not disturb that determination unless it is clearly wrong." Figueroa, 673 A.2d at 1091; see also Clements, 83 A.3d at 565. When a cautionary instruction has been given, "[a] mistrial will be ordered at the appellate level only if we are convinced that the cautionary instructions were untimely or ineffective, or if the improper material had been so indelibly etched in the jurors' minds that, despite [the trial justice's] timely action, the trial justice did not disabuse the jurors' minds of the prejudicial effect." State v. Hoyle, 122 R.I. 45, 48, 404 A.2d 69, 71 (1979); see Mendoza, 889 A.2d at 158.[3]

## 2. Discussion

The defendant contends that the trial justice erred in not passing the case after the prosecutor's improper questioning which led to Yvonne's "[e]motional [b]reakdown."[4] The defendant argues that both Jessica and her mother were "explicit" about Jessica's never having told her mother any details of the sexual assaults and yet, despite that state of the record, the prosecutor "ambushed [Yvonne] with the presentation of explicit details about [Jessica's] claims." The defendant posits that "the state's callous questions were designed for theatrical effect and to cause the predictable and public emotional breakdown of [Yvonne];" defendant

---

[3]     We note that, in our decision in State v. Hoyle, 122 R.I. 45, 48, 404 A.2d 69, 71 (1979), we remarked that the same "principles control," regardless of whether or not "the conduct complained of is a display of emotion or other objectionable conduct rather than an improper remark."

[4]     Many of the filings referenced in this Court's discussion have headings which employ bold-face type. We have conformed those headings to our usual style throughout this opinion.

adds that those questions "served no legitimate testimonial purpose." The defendant avers that "the prejudice inuring from the prosecutor's improper questioning was demonstrably incurable." Moreover, according to defendant, the "most telling evidence" of the "prejudicial effect" of the prosecutor's questioning "and of the ineffectiveness of the trial justice's cautionary instruction" was that the trial justice himself referenced Yvonne's breakdown as evidence of her credibility when ruling on defendant's motion for a new trial. Accordingly, it is defendant's contention that the trial justice recognized that the questioning was improper and prejudicial and therefore, that, he abused his discretion in not granting defendant's motion to pass the case.

In response, the state, "for its part, stands by the argument that the defendant opened the door to the prosecutor's line of inquiry when, on cross-examination, counsel pressed [Yvonne] about her daughter's failure to inform her mother of [defendant's] conduct in explicit sordid detail * * * ." The state adds that it "respectfully disagrees with the trial justice's determination that this line of questioning by the prosecutor was improper." According to the state, the defendant cannot "justifiably complain that the prosecutor questioned [Yvonne] on re-direct examination concerning <u>the very same information</u> his counsel pressed that witness about on cross-examination." (Emphasis in original.) The state avers that defendant "made an issue out of [Jessica's] reluctance to disclose to [Yvonne] the specific details of [defendant's] conduct" and, consequently, "when [defendant] claimed that [Jessica's] silence on the matter of the sexual abuse was evidence of fabrication, it became the State's job to provide the jury with an explanation for her hesitancy to confide such sordid information to her mother." The state further contends that any prejudice which may have resulted from the questioning at issue was cured by the trial justice's curative instruction to the jury.

A trial justice, in considering a motion to pass a case, "must determine whether the evidence would cause the jurors to be so inflamed as to make them unable to decide the case on the basis of the evidence presented." State v. Oliveira, 882 A.2d 1097, 1127 (R.I. 2005). "If the prejudice is inexpiable, the motion to pass should be granted. If the prejudice can be cured, the instructions which follow must be timely and effective." Hoyle, 122 R.I. at 48, 404 A.2d at 70; see also Disla, 874 A.2d at 198. However, there is no "precise formula" to determine whether any prejudicial taint may have been cured by a cautionary instruction. Oliveira, 882 A.2d at 1127; see also Hoyle, 122 R.I. at 48, 404 A.2d at 70. Therefore, "[e]ach case must be decided on an ad hoc basis and each challenged remark must be viewed in the context in which it appeared and in light of the attendant circumstances." Hoyle, 122 R.I. at 48, 404 A.2d at 70-71. Since the trial justice decided to "utilize a cautionary instruction" in the instant case, "the question before us is whether [the trial justice's] instruction can be fairly said to have removed from [the jurors' minds], when weighing the evidence properly before them, the taint represented" by Yvonne's emotional response to the prosecutor's questions on redirect examination, which questions provided her, for the first time, with the specific details of the assaults to which her daughter was subjected. State v. Brown, 528 A.2d 1098, 1103 (R.I. 1987) (internal quotation marks omitted).

We need not, and consequently we do not, make any judgment on the propriety of the prosecutor's questions to Yvonne; if we assume arguendo that those comments were inappropriate, it is nonetheless our conclusion that any prejudice which may have resulted was effectively and efficiently cured by the trial justice's instruction to the jury.

Without any evidence "that the jury was not capable of complying with the trial justice['s] cautionary instruction, this [C]ourt must assume that the jury did disregard the witness [reaction] as it was instructed to do." Disla, 874 A.2d at 198 (internal quotation marks omitted);

see also Mendoza, 889 A.2d at 159. Unquestionably, "the entire rationale underlying the structure of jury trials and the lyrical deference that is paid to jury findings rests upon the proposition that jurors will obey the admonitions of the trial justice and will apply the law as given to them by the justice presiding." Disla, 874 A.2d at 198 (internal quotation marks omitted); see also Mendoza, 889 A.2d at 159. In spite of defendant's contention that any prejudice in the instant case was "demonstrably uncurable," we can perceive nothing in the record that indicates that any taint which might have existed was not cured by the trial justice's curative instruction; we likewise can perceive nothing in the record that indicates that the jury chose to disregard the trial justice's curative instruction. See McManus, 941 A.2d at 234 ("[W]e cannot conclude that the jury would be so affected by the question that they would not be able to decide the case based on a dispassionate evaluation of the evidence.") (internal quotation marks omitted).

It is worth noting that the curative instruction given by the trial justice clearly and thoroughly explained to the jury that it was not to allow any sympathy which it might have for Yvonne to affect its determination as to her credibility or the credibility of the other witnesses. (We also note approvingly that the trial justice included a substantially similar instruction in his final charge to the jury.) He even reminded the jury that the case rose and fell "on the testimony of the young complaining witness." The trial justice also gave the instruction in a timely manner, immediately after the questioning at issue. See Hoyle, 122 R.I. at 48, 404 A.2d at 71. Moreover, we note that, despite Yvonne's emotional response to the questioning on redirect examination, the jury nonetheless found defendant not guilty on twelve out of the fourteen counts against him. Lastly, it is worth remarking that the information which formed the basis of

the prosecutor's questions was simply cumulative to other testimony at trial, and thus it was not a situation where the jury was exposed to additional, prejudicial information.

In our judgment, after reviewing the record, considering the context in which Yvonne's emotional response was elicited, and the trial justice's curative instruction, there is no reason to believe that the jury in the instant case was not able to make an objective evaluation of the evidence against Mr. Hie. See Oliveira, 882 A.2d at 1127; Hoyle, 122 R.I. at 48, 404 A.2d at 70-71. Accordingly, we hold that the trial justice did not abuse his discretion when he denied defendant's motion to pass the case.

**B**

**Motion for a New Trial**

**1.  Standard of Review**

When ruling on a motion for a new trial, the trial justice "acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." State v. Barrios, 88 A.3d 1123, 1128 (R.I. 2014) (internal quotation marks omitted); see also State v. Baker, 79 A.3d 1267, 1273 (R.I. 2013); State v. Paola, 59 A.3d 99, 104 (R.I. 2013); State v. Guerra, 12 A.3d 759, 765 (R.I. 2011). In fulfilling his or her role as the thirteenth juror and passing on a motion for a new trial, "the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." State v. Silva, 84 A.3d 411, 416 (R.I. 2014) (internal quotation marks omitted); see also State v. Mitchell, 80 A.3d 19, 30 (R.I. 2013); State v. Espinal, 943 A.2d 1052, 1058 (R.I. 2008); State v. Morales, 895 A.2d 114, 121 (R.I. 2006). If, after carrying out this three-step analytical process, "the trial justice agrees with the jury's verdict or determines

that reasonable minds could differ, then the analysis is complete and the verdict should be affirmed." State v. Harrison, 66 A.3d 432, 445 (R.I. 2013) (internal quotation marks omitted); see also State v. Bunnell, 47 A.3d 220, 232 (R.I. 2012); State v. Kizekai, 19 A.3d 583, 590 (R.I. 2011). However, if the trial justice "does not agree with the verdict or does not agree that reasonable minds could differ, then the trial justice must determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." Harrison, 66 A.3d at 445 (internal quotation marks omitted); see State v. Gonzalez, 56 A.3d 96, 102 (R.I. 2012).

With respect to a trial justice's ruling on a motion for a new trial, we have stated that the "record should reflect a few sentences of the justice's reasoning on each point." State v. DiCarlo, 987 A.2d 867, 870 (R.I. 2010) (internal quotation marks omitted); see also Silva, 84 A.3d at 417. Nonetheless, we have also stated that, in providing the rationale for his or her decision, a trial justice does not need to "refer to all the evidence supporting the decision; rather, he or she need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." State v. Robat, 49 A.3d 58, 71 (R.I. 2012) (emphasis in original) (internal quotation marks omitted); see also DiCarlo, 987 A.2d at 870.

We accord "great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." Robat, 49 A.3d at 71 (internal quotation marks omitted); see Espinal, 943 A.2d at 1058; see also State v. Day, 925 A.2d 962, 983-84 (R.I. 2007). Accordingly, we will not disturb a trial justice's decision with respect to a motion for a new trial "unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." DiCarlo, 987 A.2d at 871 (internal quotation marks omitted); see State v. Payette, 38 A.3d 1120, 1127 (R.I. 2012); see also Harrison, 66 A.3d at 445. When conducting a review of a

denial of a motion for a new trial, "we do not focus on whether this Court simply agrees or disagrees with the trial justice's credibility determinations," but rather we are "deferential to those determinations;" and "we will not overturn that decision unless the trial justice has overlooked or misconceived material evidence or was otherwise clearly wrong." State v. Clay, 79 A.3d 832, 842 (R.I. 2013) (internal quotation marks omitted); see also Gonzalez, 56 A.3d at 104; Bunnell, 47 A.3d at 232-33. We have repeatedly noted that "[t]his Court affords a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." Paola, 59 A.3d at 106 (internal quotation marks omitted); see Barrios, 88 A.3d at 1130; see also DiCarlo, 987 A.2d at 872.

### 2. Discussion

The defendant contends that, in denying his motion for a new trial, "the trial justice overlooked and misconceived material evidence which established doubt that [defendant] was the perpetrator of two counts of second degree child molestation." Specifically, he claims that the close quarters in Jessica's bedroom coupled with the fact that Jessica testified that she never cried out, the fact that her sisters never awoke at any point when Jessica was being assaulted, and the fact that Jessica never opened her eyes, calls "into question the reliability of [Jessica's] testimony." It is defendant's position that "the jury surely wondered whether [Jessica's] claims were the accurate memories of a young girl or imaginary nighttime visions" and, according to defendant, the trial justice should have "similarly scrutinized" Jessica's claims.

The defendant also contends that, in denying his motion for a new trial, the trial justice improperly relied upon "deeply prejudicial testimony that he ordered stricken from the record."

The defendant refers to the emotional response of Yvonne to the prosecutor's questions on redirect examination, which questions disclosed the details of Jessica's assaults to her mother for the first time. It is defendant's contention that, if "an experienced, impartial jurist like [the trial justice] was so influenced by [Yvonne's] emotional outburst that he did not follow his own cautionary instruction to the jury * * * it only follows that [Yvonne's] reaction produced both passion and prejudice against [defendant] for those that observed her courtroom tears."

The state avers that defendant's argument is flawed given that it "overlooks the great weight accorded to the trial justice's ruling;" it further contends that, by finding Jessica credible, the trial justice "articulated adequate reasoning to uphold the jury's verdict and any consideration of the testimony of [Yvonne] was superfluous to the ruling."

The trial justice in the instant case properly followed the required three-step analysis in ruling on defendant's motion for a new trial. First, he considered the evidence in light of the jury charge; the trial justice addressed with specificity the multiple incidents of sexual assault alleged by Jessica, and he noted that Adriana's testimony "corroborated" Jessica's testimony. He further considered Yvonne's testimony with respect to the fact that she installed a lock on Jessica and Adriana's bedroom, and he stated that "the inference was she was somewhat suspicious of defendant as the girls got older * * * ." In ruling on defendant's motion for a new trial, the trial justice considered the testimony of every witness who testified at trial. He also commented on the evidence in light of the jury charge on sexual assault. See Silva, 84 A.3d at 416.

Next, the trial justice properly weighed the evidence and addressed the credibility of the witnesses. See id. After explicitly recognizing that he had to conduct his own independent review of the evidence, the trial justice discussed Jessica's testimony. He began by noting that she was "very unemotional" and "fairly monotone;" but he added that he did not find that

"totally unusual in cases like [the one before him]." He noted that, when Jessica testified regarding the assault for which defendant was convicted, she stated that she had her eyes closed but that she had felt "rough hands;" the trial justice added that a "reasonable inference" could be drawn from that testimony that defendant "perpetrated these crimes against her," because "[h]e was the only adult in the building, living there" and Jessica "knew he was living there" and "had rough hands." The trial justice concluded that Jessica was a "credible witness" and stated:

> "I thought that her testimony, while delivered in a monotone, flat manner, was as a result of her embarrassment of having to live through the motion, [sic] live through the emotion of telling the story again that had happened so long ago, that she could look at it perhaps from a distance now as a young woman and just relate what she remembered from the facts."

The trial justice proceeded to find Adriana to be "credible" and Yvonne to be "extremely credible." We note that the mere fact that defendant might disagree with the trial justice's determination that each of the witnesses at trial was credible does not require the trial justice to grant defendant's motion for a new trial. See id. at 418 ("This Court has repeatedly stated that [t]he mere fact that [a] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for new trial.") (internal quotation marks omitted); see also Gonzalez, 56 A.3d at 103.

With relation to the third step in his analysis, the trial justice remarked that he was "surprised" by the verdict. However, he stated that there potentially might have been "some compromise" among the jurors. The trial justice concluded as follows:

> "[T]he Court believes that based on the evidence, based on the credibility of the witnesses here, and based on particularly the fact that there were five discreet [sic] instances complained of that the Court cannot, I don't disagree with the verdict because I thought the witnesses were credible as to all counts * * * ."

Thus, it is clear that, after properly assessing the evidence and weighing the credibility of the witnesses, the trial justice concluded that he could not "disagree with the [jury's] verdict." As such, his "analysis [was] complete," and he denied defendant's motion for a new trial. Harrison, 66 A.3d at 445. We perceive no error in the trial justice's progression through the three required steps or in his conclusion that he could not "disagree with the verdict."

The defendant contends that the trial justice did not properly take into account the fact that, as defendant states, the verdicts were "inconsistent." However, the trial justice clearly addressed defendant's argument that the verdicts were inconsistent; he stated that they were in fact "inconsistent." See State v. Staffier, 21 A.3d 287, 291 (R.I. 2011). But he went on to state that Jessica was a credible witness and that it is possible that the jury compromised in finding defendant guilty on two of the fourteen counts. See id. at 292 ("We also recognize that in cases in which juries reach inconsistent verdicts on different counts of the same information, the jury may reach compromises through a variety of motivations, including leniency."). Consequently, we are satisfied that the trial justice properly took into account the fact that the verdicts in this case could be characterized as inconsistent.

Finally, defendant takes issue with the trial justice's reference to Yvonne's emotional response to the questions regarding the specifics of Jessica's sexual assault. In denying defendant's motion for a new trial, the trial justice stated: "I thought the mother was extremely credible particularly after she was made aware of what the nature of the allegations was which apparently heretofore [she] had not been aware of." While it is true that the trial justice instructed the jury not to let sympathy affect their assessment of Yvonne's testimony, he did not instruct the jury to utterly disregard her reaction. He expressly stated:

> "I'm not going to do anything other than caution you not to allow
> [the line of questioning on redirect examination] to enter into your

deliberations with regard to overt sympathy. You may take this witness's testimony and weigh it and sift as you would anyone else * * * ."

In our view, in denying defendant's motion for a new trial, it would have been preferable for the trial justice to pass over in silence Yvonne's emotional breakdown on the witness stand; but there is nothing in the trial justice's comments that would suggest that he was doing what he instructed the jury not to do—namely, letting sympathy affect his determination of Yvonne's credibility. Therefore, we consider defendant's contention that it was error for the trial justice to mention Yvonne's emotional response in denying his motion for a new trial to be unavailing.

Accordingly, in our judgment, the trial justice did not misconceive or overlook material testimony and did not otherwise commit clear error in denying the defendant's motion for a new trial.[5]

---

[5] The defendant also raises a challenge to the trial justice's denial of his motion for a judgment of acquittal, which he made at the close of the prosecution's case and at the close of all the evidence. It should be recalled that we have stated as follows:

> "When faced with a defendant's challenge to the rulings on both [a motion for a judgment of acquittal and a motion for a new trial], this Court first conducts a review of the new-trial motion. * * * The motion for a new trial requires a more exacting analysis, * * * therefore unless a defendant can show that the presented evidence failed to support his or her conviction upon the motion-for-a-new-trial standard, a defendant necessarily will be unable to establish he or she was entitled to a judgment of acquittal." State v. Richardson, 47 A.3d 305, 317 (R.I. 2012) (internal quotation marks omitted); see also State v. Pineda, 13 A.3d 623, 640 (R.I. 2011).

Accordingly, in the instant case, since defendant has been unable to establish that the trial justice erred in denying his motion for a new trial, it follows a fortiori that he cannot establish that the trial justice erred in denying his motion for judgment of acquittal.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction and its denial of the defendant's motion for a new trial. The record in this case may be returned to that tribunal.

Justice Indeglia did not participate.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        State v. Darnell Hie.

**CASE NO:**        No. 2012-83-C.A.
                        (P1/10-1705A)

**COURT:**        Supreme Court

**DATE OPINION FILED:**    June 27, 2014

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

**WRITTEN BY:**        Associate Justice William P. Robinson

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                Associate Justice Francis J. Darigan, Jr.

**ATTORNEYS ON APPEAL:**

                For State:  Jane M. McSoley
                        Department of Attorney General

                For Defendant:  Kara M. Hoopis
                        Office of the Public Defender