**Supreme Court**

No. 2013-290-C.A.

(P1/12-1092ADV)

State                          :

v.                          :

Donald Greenslit.              :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                    :

v.                                    :

Donald Greenslit.                        :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The defendant, Donald Greenslit, appeals from a judgment of conviction rendered after a jury trial held in the Providence County Superior Court on the following counts: Count One, the first-degree murder of Stacie Dorego, in violation of G.L. 1956 §§ 11-23-1, 11-23-2, and G.L. 1956 § 12-29-5; Count Two, the failure to report the death of Stacie Dorego with the intention of concealing a crime, in violation of G.L. 1956 § 23-4-7(f); Count Three, the obstruction of a firefighter while in the execution of his duty, in violation of G.L. 1956 § 11-32-1; and Count Four, the violation of a no-contact order, in violation of §§ 12-29-4 and 12-29-5.  On appeal to this Court, the defendant contends that the trial justice erred in denying his motion for a new trial.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

On March 29, 2012, a Providence County grand jury indicted defendant on the above-referenced charges of which he was eventually convicted.  A jury trial was held over two weeks in March of 2013.  We summarize below the salient aspects of that trial.

## A

### The Testimony of Jami Ouellette

Jami Ouellette, the sister of the murder victim, Stacie Dorego, testified that, in 2012, Ms. Dorego lived at 16 Pershing Road in Johnston. Ms. Ouellette further testified that she spoke to defendant when he telephoned her a few weeks before Ms. Dorego's death. She stated that, at the time of that phone call, it had been "rare" for him to call her; she said that he did so approximately once every four months. She testified that defendant told her that he was concerned about his children and that he was unable to enter the home where they resided because of a restraining order. She stated that it was "very difficult to understand" defendant in the course of that phone call; she added that defendant was "kind of going on and on, repeating himself." She further stated that she offered to call the Department of Children, Youth, and Families (DCYF), but that defendant told her not to do so. Ms. Ouellette testified that defendant said that he could not contact DCYF, in spite of her suggestion that he do so. It was her further testimony that defendant told her "not to worry because [his] mom had money and was able to take care of the kids * * * and the kids would be fine."

## B

### The Testimony of Francis O'Brien

Francis O'Brien, a friend of defendant, testified that, on the morning of January 22, 2012, defendant left him a "vague" message, indicating that he had the "best news in the world" for him and that he needed his help. Mr. O'Brien testified that he went to 16 Pershing Road, where defendant was at that time, and he observed that defendant was "very happy." He also stated that defendant told him that Ms. Dorego had "taken off with a boyfriend to an island * * *." He

further stated that defendant discussed with him the possibility of his moving to the house at 16 Pershing Road.

## C

## The Testimony of Chiara Scarcella

Chiara Scarcella testified that she lived at 14 Pershing Road—i.e., next door to 16 Pershing Road.  It was her testimony that it was not uncommon for defendant to come to her house and "ask to use things."  She testified that, on January 22, 2012, defendant came to her house several times during the day.

Ms. Scarcella testified that, upon returning home from doing an errand on the evening of January 22, she smelled smoke and saw that the kitchen of 16 Pershing Road was filled with smoke.  She stated that she went into the 16 Pershing Road house because she knew that children were inside and she wanted them to get out.  She stated that, once she was in the house, defendant told her that he was burning wood because the children were cold and that he had "everything under control."  It was her testimony that defendant's demeanor was "odd" and "nervous" during their conversation; she added that he seemed "[a]ngry that [she] was in the house."

Ms. Scarcella stated that she then left the 16 Pershing Road house and her cousin called the Fire Department.  She testified that, when the police officers and firefighters arrived, defendant was "very mad" and said: "'Why did you call the cops?'"  She noted that he looked "panicked" and was pacing.  She said that defendant told the firefighters that there were no children in the house, although she knew that two children were there.  She stated that, when defendant was speaking to the firefighters about the children not being in the house, they were attempting to enter; she testified that defendant was blocking them with his body by standing in

- 3 -

the middle of the doorway. She further testified that his blocking activity as he stood in the doorway prevented a firefighter from entering the house for about forty seconds; she added that, when a particular firefighter learned that there were children in the house, he pushed defendant out of the way.

**D**

**The Testimony of Chief Ronald Castelli**

Ronald Castelli, a Battalion Chief in the Johnston Fire Department, testified that on January 22 he was called to 16 Pershing Road due to a report of smoke coming from a dwelling. Chief Castelli testified that, upon arriving at that address, he observed smoke filling one of the rooms. He stated that he went to the side door, which defendant opened. He testified that defendant told him that there was smoke in the house due to the fact that he had been lighting the fireplace while the flue was not fully open. Chief Castelli testified that he told defendant that he wanted to get the children out of the house and then help him ventilate the home. Chief Castelli stated that defendant was "very adamant" that he did not want help. Chief Castelli testified that he had to put defendant "up against the refrigerator" and that he told him that they were going to help him in spite of his protests. He testified that, after this confrontation with defendant, he exited the house. He further testified that he later saw his fellow firefighter, Lieutenant Paul Brazenor, escort defendant out of the house. Chief Castelli added that defendant's demeanor was "angry" and that he was insistent about wanting to stay in the house.

**E**

**The Testimony of Lieutenant Paul Brazenor**

Lieutenant Paul Brazenor of the Johnston Fire Department testified that, after arriving at 16 Pershing Road, he first encountered defendant when he opened the door to the basement and

saw him coming up the cellar stairs. He testified that that first encounter was "uneventful;" he added that he escorted defendant out of the home and said: "'Let us do our job. I'll take you outside, get you some help. Let us do what we do.'" Lieutenant Brazenor further testified that he made his way to the cellar door again and, when he opened it, he was met by defendant at the top of the stairs. He stated that he began yelling at defendant, telling him that he was in the way of the firefighters and saying: "'I told you to get out of the house. What are you doing here? You need to leave now.'" He testified that he spun defendant around, forcibly escorting him down the hallway while screaming at him and forcibly bringing him outside. Lieutenant Brazenor further testified that defendant said: "'It's not a problem. Why are you guys doing this to me? I don't see the problem.'" He characterized defendant as "very despondent" and said that he did not come with him willingly and was "dragging his feet a little bit."

Upon returning to the basement, Lieutenant Brazenor discovered what were later confirmed to be the remains of Stacie Dorego.

**F**

**The Testimony of Kevin Brady**

Kevin Brady, a police officer in the Johnston Police Department, testified that, as Lieutenant Brazenor of the Johnston Fire Department was escorting defendant out of the house, he said: "'Would somebody please detain this guy? He keeps coming back into the house.'" Officer Brady testified that it appeared that Lieutenant Brazenor was forcibly escorting defendant out of the house. Officer Brady stated that he then detained defendant by standing in front of him and keeping him in a "confined area." He testified that defendant looked at the house and said several times in an "aggressive" tone: "'Get out of my f* * *ing house. I'm a good father.'" Officer Brady characterized defendant as having been "belligerent."

**G**

**The Testimony of Alex Boisclair**

Alex Boisclair, who was detained with defendant at the Adult Correctional Institutions (ACI), testified that defendant had shared the details of the murder with him.[1] He testified that defendant told him that, around Christmastime of 2011, he had seen an e-mail from Ms. Dorego to one of her friends in which she stated that she had been unfaithful to defendant for the previous two years. Mr. Boisclair further testified that defendant told him that he had spoken to Ms. Dorego's sister "about if anything happened to him or her, meaning Stacie [Dorego], that the kids would be all set with her, she'd take care of them." Mr. Boisclair testified that defendant said that, since Christmastime, he had been planning for the care of his children in the event that he and Ms. Dorego could no longer care for them.

Mr. Boisclair said that defendant told him that, at the time when the crimes at issue were committed, Ms. Dorego had been on the bed and had asked defendant to "join her in bed." He said that defendant told him that he had said to Ms. Dorego, "No, it's not going to happen" and she responded: "Why not?" He testified that defendant said that Ms. Dorego then sat up and moved off the bed towards him. Mr. Boisclair stated that defendant told him that he then "grabbed the knife and * * * stabbed her five times."

---

[1] Mr. Boisclair provided information about Ms. Dorego's death to the Johnston Police Department that was not yet publicly known, but that was consistent with what would be the evidence at trial. An example of the information of that nature that Mr. Boisclair said was conveyed to him by defendant would be the fact that, in the kitchen at 16 Pershing Road, defendant had left a phone book open to a page containing truck rental listings. Detective Joshua Haywood testified that a still photograph of the kitchen, which was taken by investigators and eventually entered into evidence at trial, revealed a phone book lying open to a page containing truck rental listings.

Mr. Boisclair testified that, during their time together at the ACI, defendant displayed no remorse and that it was "almost as if [Ms. Dorego's death] was weight off his shoulders;" he characterized defendant's emotional state as "excited."

## H

### The Testimony of Dr. Christina Stanley

Doctor Christina Stanley, the Chief Medical Examiner for the State of Rhode Island, testified that she performed an examination of the remains found at 16 Pershing Road. She stated that a definitive identification was made to the effect that the remains were those of Stacie Dorego. She further testified that there were three detectable stab wounds in Ms. Dorego's heart, which had caused her death. Doctor Stanley stated that the manner of death was "homicide."

## I

### The Verdict and Subsequent Motion for New Trial

The jury returned a verdict finding defendant guilty on all four counts.[2] He was sentenced to the following terms: on Count One, life imprisonment; on Count Two, five years to serve; on Count Three, one year to serve; and on Count Four, one year to serve. Each of the latter three sentences is to be served consecutively.

The defendant having moved for a new trial, on March 27, 2013, a hearing was held on that motion, at the conclusion of which the trial justice denied the motion. A timely notice of appeal was filed.

---

[2] The defendant was found guilty of both the failure to report the death of Stacie Dorego with the intention of concealing a crime and the violation of a no-contact order, but he has not appealed from those convictions.

## II

## Standard of Review

When addressing a motion for a new trial which posits that the weight of the evidence was inadequate to support a conviction, the trial justice "acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." State v. Hie, 93 A.3d 963, 974 (R.I. 2014) (internal quotation marks omitted); see State v. Gonzalez, 56 A.3d 96, 102 (R.I. 2012); State v. Adefusika, 989 A.2d 467, 480 (R.I. 2010). The trial justice is required to engage in a three-step analysis. Hie, 93 A.3d at 974; Gonzalez, 56 A.3d at 102; Adefusika, 989 A.2d at 480. He or she must "(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." Hie, 93 A.3d at 974 (internal quotation marks omitted); Gonzalez, 56 A.3d at 102; Adefusika, 989 A.2d at 480. If, after completing that three-step analytical process, "the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." Gonzalez, 56 A.3d at 102 (internal quotation marks omitted). However, if the trial justice does not agree with the jury's verdict or "does not agree that reasonable minds could differ as to the proper disposition of the case," then the trial justice must complete a fourth analytical step in which he or she "determine[s] whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." Id. (internal quotation marks omitted); see Hie, 93 A.3d at 975; State v. Robat, 49 A.3d 58, 71 (R.I. 2012); Adefusika, 989 A.2d at 480. If the trial justice concludes that "the verdict meets this standard, then a new trial may be granted." State v. Rosario, 35 A.3d 938, 947 (R.I. 2012) (internal quotation marks omitted).

This Court has indicated that, with respect to a trial justice's ruling on a motion for new trial, the "record should reflect a few sentences of the [trial] justice's reasoning on each point." Hie, 93 A.3d at 975 (internal quotation marks omitted); see State v. Garrett, 91 A.3d 793, 800 (R.I. 2014); Robat, 49 A.3d at 71. In providing his or her rationale, the trial justice is not required to "refer to all the evidence supporting the decision; rather, he or she need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." Robat, 49 A.3d at 71 (internal quotation marks omitted); see Hie, 93 A.3d at 975; Gonzalez, 56 A.3d at 102.

When we review a trial justice's denial of a motion for a new trial, "[i]f the trial justice has complied with [the above-summarized] procedure and articulated adequate reasons for denying the motion, his or her decision will be given great weight and left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." Garrett, 91 A.3d at 800; see Hie, 93 A.3d at 975; Robat, 49 A.3d at 71. This Court is deferential to the trial justice's ruling because "a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." Gonzalez, 56 A.3d at 103 (internal quotation marks omitted); see Robat, 49 A.3d at 71. In the same vein, we have stated that "[t]his Court affords a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." Hie, 93 A.3d at 975 (internal quotation marks omitted).

# III

## Analysis

On appeal, defendant contends that the trial justice erred when she conducted a review of the weight of the evidence and concluded that it was adequate to support the conviction for first-degree murder and obstruction of a firefighter while in the execution of his duty.[3] Specifically, defendant argues that the "[s]tate failed to present evidence of premeditation sufficient to justify a conviction for first degree murder." Furthermore, with respect to the obstruction charge, defendant argues that he had not been told that he could not reenter his home when he encountered Lieutenant Brazenor on the basement stairs for a second time, and he points to the fact that he did not reenter the home once he had been instructed not to go back inside.

In the instant case, the trial justice adhered to the requisite three-step analysis, to which she explicitly alluded at the outset of her ruling on defendant's motion for a new trial. See generally Gonzalez, 56 A.3d at 102; Adefusika, 989 A.2d at 480.

The trial justice began by summarizing the testimony and evidence presented at trial. Next, the trial justice engaged in the first step of the three-step analysis by considering the evidence in light of the jury charge. See Hie, 93 A.3d at 974; Gonzalez, 56 A.3d at 102; Adefusika, 989 A.2d at 480. With respect to the charge of first-degree murder, the trial justice recognized that premeditation is the critical differentiating factor between murder in the first

---

[3] As we have frequently indicated, a motion for a new trial may be predicated on one of two different grounds. State v. Clark, 974 A.2d 558, 569-70 (R.I. 2009); see State v. Fleck, 81 A.3d 1129, 1133 (R.I. 2014). A defendant may argue that the "weight of the evidence was not adequate to convict him, or, in the alternative, he may argue that the evidence was legally insufficient to support a conviction." Fleck, 81 A.3d at 1133. In the instant case, defendant states that there was "insufficient evidence presented to the jury to withstand a conviction for first degree murder or obstruction of a firefighter while in the execution of his duty." However, defendant has opted to provide this Court exclusively with authorities relative to the standard of review pertaining to the weight of the evidence. Accordingly, we shall consider defendant to have based his appeal solely on a challenge to the weight of the evidence.

degree and murder in the second degree.  See State v. Gillespie, 960 A.2d 969, 976-77 (R.I. 2008) (stating that "the distinction between first-degree and momentary-intent-based second-degree murder is the duration of the defendant's intent to kill") (emphasis in original). Accordingly, the trial justice noted that, before the time of the murder, defendant had called Ms. Ouellette and discussed "what would happen to the children" and indicated that "they would be taken care of."  Additionally, the trial justice noted that Mr. Boisclair testified that defendant had shared the details of Ms. Dorego's murder with him and indicated that he had been planning her murder since concluding around Christmastime that she had been unfaithful to him.  The trial justice also noted that Mr. Boisclair testified that defendant discussed with him his phone call to Ms. Ouellette.  The trial justice further noted that Mr. O'Brien said that defendant had discussed with him the possibility of Mr. O'Brien moving into the 16 Pershing Road home when he saw him on January 22 and also indicated to Mr. O'Brien that Ms. Dorego had left with a boyfriend. The trial justice observed that such behavior lacked the "volatility [or] passion as to what had happened," which is sometimes seen in second-degree murder or manslaughter.  The trial justice concluded that, after examining the evidence in light of the charge to the jury, the evidence was sufficient to support the jury's finding that Stacie Dorego was the victim of first-degree murder.

With respect to the charge of obstruction of a firefighter, the trial justice noted that, after Lieutenant Brazenor encountered defendant for the first time, he escorted him out of the house and asked him to let the firefighters do their job, but that when Lieutenant Brazenor attempted to enter the basement a second time, defendant was again at the top of the stairs.  The trial justice noted that Lieutenant Brazenor became angry with defendant, forcibly removed him from the home, and asked other officers to detain defendant because he was obstructing him.  The trial justice also noted that defendant's "manner of interaction" with the firefighters was reflected in

Chief Castelli's testimony that he had to move defendant out of the way so that a firefighter could remove the children from the home. In the trial justice's view, that evidence was sufficient to support the charge of obstructing the firefighters.

The trial justice completed the second step of the required analysis by independently assessing the credibility of the witnesses and the weight of the evidence. See Hie, 93 A.3d at 974; Gonzalez, 56 A.3d at 102; Adefusika, 989 A.2d at 480. She said that she found all the witnesses to be credible. Notably, the trial justice indicated that she believed Lieutenant Brazenor and Chief Castelli and concluded that they were "credible as to their observations on that evening." She also determined that Ms. Ouellette was credible and was "telling the truth." The trial justice noted that Mr. Boisclair was the only witness whose credibility was called into question by defendant at trial. Nevertheless, the trial justice found Mr. Boisclair to be "credible" and "truthful;" she added that, although Mr. Boisclair had initially sought to use the information shared with him by defendant as a "get-out-of-jail card," he stated that he decided to testify, even though he did not gain anything by doing so, because it was "the right thing to do." The trial justice further noted that, at the time Mr. Boisclair disclosed the information to the Johnston Police, some of it was not publicly known, so that he could have learned of it only from defendant.

Next, the trial justice completed the third step of the analysis by determining whether she would have reached a different result from that reached by the jury. See Hie, 93 A.3d at 974; Gonzalez, 56 A.3d at 102; Adefusika, 989 A.2d at 480. The trial justice explicitly stated that she agreed with the jury's verdict and "would have found the defendant guilty of all these four charges that [were] submitted to the jury."

Accordingly, the trial justice denied defendant's motion for a new trial. We do not perceive any error in the trial justice's application of the three-step analysis or in her agreement with the jury's verdict.

Although the trial justice addressed and dealt with the motion for a new trial in a completely proper manner, we have chosen in this instance to opine further about two specific contentions raised on appeal by defendant. He argues that the "[s]tate failed to present evidence of premeditation sufficient to justify a conviction for first degree murder." See State v. Rodriguez, 822 A.2d 894, 909 (R.I. 2003) (noting that the "distinction between first- and second-degree murder is whether the evidence indicates that premeditation existed for some appreciable length of time before the murder occurred or whether the evidence shows that premeditation, if it existed at all, occurred for just a mere moment before the murder"). The defendant contends that the trial justice placed great weight on his actions subsequent to Ms. Dorego's death, whereas, in his view, the trial transcript shows that he was "not acting in his right mind," which would indicate that premeditation was lacking. In fact, however, the trial justice looked to Mr. Boisclair's testimony about what defendant said to him as evidence of premeditation. She observed that "[o]n his testimony alone, we certainly have enough information for a jury to consider the charge of * * * first degree murder." The trial justice also looked to the timing of defendant's phone call to Ms. Ouellette as evidence of premeditation. That phone call was made around Christmastime, and Mr. Boisclair testified that defendant had told him about discovering what he deemed to be evidence of Ms. Dorego's infidelity. Although defendant argues that his actions after Ms. Dorego's death show that he "was not acting in his right mind," the trial justice found that his actions did not show the "volatility [or] passion as to what had happened" that is characteristic of second-degree murder; and we see no basis for rejecting that finding.

Consequently, we are satisfied that the trial justice placed adequate weight on defendant's actions prior to Ms. Dorego's death in determining that her murder was premeditated.

The defendant further contends that Mr. Boisclair's testimony establishes "a fleeting intent" on defendant's part that was "contemporaneous with the act of stabbing Ms. Dorego," rather than premeditation. It should be recalled, however, that the trial justice did not rely solely on Mr. Boisclair's testimony regarding the murder itself, but rather looked to the timing of the discovery of Ms. Dorego's purported infidelity, which coincided with defendant's phone call to Ms. Ouellette.

The defendant also contends that his phone conversation with Ms. Ouellette could not establish premeditation because it was merely an expression of his concern for his children. However, the trial justice looked not only to the content of the conversation, but also the timing of the phone call as evidence that he had planned the murder with premeditation. Accordingly, it is our view that the trial justice did not err when she determined that the evidence was adequate to support a conviction for first-degree murder.

With respect to the conviction for obstruction of a firefighter, defendant argues that he was not explicitly told that he could not return inside the house when Lieutenant Brazenor first encountered him on the basement stairs and escorted him out of the home. On that basis, he argues that he was not obstructing the firefighters by returning to the basement. The defendant points to the fact that, after being removed from the home a second time, he complied with Lieutenant Brazenor's instruction not to go back inside, and he also notes that there was no testimony that the firefighters were "actually hindered in any way." In defendant's view, his being "merely present" inside the house at 16 Pershing Road is insufficient evidence to support a conviction for obstruction. The trial justice reasoned that defendant's presence on the basement

- 14 -

stairs during his first encounter with Lieutenant Brazenor was sufficient to support the obstruction conviction. She stated that, unless "[Lieutenant Brazenor could] somehow walk through defendant, [defendant's presence there was] an obstruction." The trial justice found defendant's return to the basement stairs after having already been removed to be of even greater significance because Lieutenant Brazenor was again distracted from his duties as a firefighter in order to remove defendant from the house for a second time. The trial justice further noted that defendant's "whole manner of interaction with the firefighters [was] also shown by Chief Castelli, who had moved him out of the way to even let the firefighter in to get the children out of the house." Moreover, although the trial justice did not specifically address whether defendant "hindered" the firefighters, defendant's return to the basement stairs after being removed from the home certainly impeded Lieutenant Brazenor in the execution of his official duty. See DeFusco v. Brophy, 112 R.I. 461, 464, 311 A.2d 286, 288 (1973) (defining "obstruction" in the context of § 11-32-1 as meaning "to interpose obstacles or impediments, to hinder, impede, or in any manner intrude or prevent, and this term does not necessarily imply the employment of direct force or the exercise of direct means") (internal quotation marks omitted).

Based on our review of the record and the trial justice's application of the three-step analysis and after consideration of the defendant's several contentions, it is clear to us that the trial justice performed the requisite analysis completely and more than adequately explained her reasoning. We perceive no basis for concluding that the trial justice was either clearly wrong or that she misconceived or overlooked material evidence when she denied the defendant's motion for a new trial. Accordingly, we uphold the trial justice's denial of the defendant's motion for a new trial.

**IV**

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be remanded to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  State v. Donald Greenslit.

**CASE NO:**  No. 2013-290-C.A.
(P1/12-1092ADV)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  March 11, 2016

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**  Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**  Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Susan E. McGuirl

**ATTORNEYS ON APPEAL:**

For State:  Lauren S. Zurier
Department of Attorney General

For Defendant:  Jodi M. Gladstone, Esq.