**Supreme Court**

No. 2012-299-C.A.

(N3/12-105A)

|              |   |
|--------------|---|
| State        | : |
| v.           | : |
| Thomas H. Matthews. | : |

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Thomas H. Matthews. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Robinson, for the Court.**  On June 18, 2012, a Newport County Superior Court jury found the defendant, Thomas H. Matthews, guilty of disorderly conduct in violation of G.L. 1956 § 11-45-1(a)(3).  Thereafter, on July 5, 2012, the trial justice imposed upon the defendant a sentence of six months, with thirty days to serve and the balance suspended, with probation.  On appeal, the defendant contends:  (1) that the trial justice erred in denying the defendant's motion for a new trial and his motion for a judgment of acquittal; and (2) that the criminal complaint lodged against the defendant was insufficient as a matter of law to place him on notice of the charge against him.  For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction and its denial of the defendant's motion for a new trial and motion for a judgment of acquittal.

# I

## Facts and Travel

On January 31, 2012, Mr. Matthews was arrested by two Rhode Island State Police troopers and charged with one count of disorderly conduct in violation of § 11-45-1(a)(3), which provides that a person commits disorderly conduct if that person "intentionally, knowingly, or recklessly[,] * * * [d]irects at another person in a public place offensive words which are likely to provoke a violent reaction on the part of the average person so addressed[.]"[1] The Superior Court jury trial on the just-referenced charge began on June 18, 2012, and the evidence presented therein consisted of testimony from the state police troopers who arrested the defendant—viz., Trooper Anthony Washington and Trooper Edward Viera.[2] We summarize below the portions of their testimony relevant to the instant appeal.

---

[1] In what was the first of several instances of confusion throughout the pendency of this case regarding the applicable subsection of the disorderly conduct statute, the criminal complaint correctly cites the statute allegedly violated as G.L. 1956 § 11-45-1(a)(3), which is often referred to as the "fighting words" provision; however, the statutory language that is quoted in the complaint is from § 11-45-1(a)(1) ("A person commits disorderly conduct if he or she intentionally, knowingly, or recklessly * * * [e]ngages in fighting or threatening, or in violent or tumultuous behavior[.]"), which is often referred to as the "behavior" provision. Nevertheless, it is important to note from the outset that, at all critical points in the course of the litigation, the court and the parties unquestionably focused on the elements of the crime that are set forth in § 11-45-1(a)(3), and so we too proceed with our attention dedicated to the just-referenced provision.

[2] Mr. Matthews was first convicted of disorderly conduct after a jury-waived trial in the District Court; pursuant to G.L. 1956 § 12-22-1 and Rule 37 of the District Court Rules of Criminal Procedure, defendant exercised his right to a trial de novo in the Superior Court.

**A**

**The Testimony at Trial[3]**

**1. The Testimony of Trooper Anthony Washington**

Trooper Washington[4] testified that, at approximately 1:00 a.m. on January 31, 2012, he and Trooper Viera were traveling together in a police cruiser in Middletown, Rhode Island; he said that, as he turned onto West Main Road, he saw from about one hundred feet away what he referred to as an "altercation" between a man and a woman. (During his testimony at trial, Trooper Washington identified the man as defendant Thomas Matthews.) When asked at trial to be more specific about his observations, Trooper Washington added that he saw the pair "hugging, doing something" and that "the male was yelling and screaming." Trooper Washington testified that he did not get a "full look" at the man and woman as he drove past them and that he accordingly made a U-turn to approach the pair again. Trooper Washington further testified that, as he made the turn, he observed the two persons "yelling and screaming" at each other.

Trooper Washington further testified that, after he made the U-turn, he and Trooper Viera drove up to where the two individuals stood; he added that both troopers immediately stepped

---

3    We note that, in the testimony of both troopers, the various epithets allegedly uttered by defendant on the night of his arrest were transcribed without redaction. We have chosen to reproduce their testimony in this opinion in a similarly unbowdlerized fashion because what defendant is alleged to have actually said is so central to the issues on appeal. Unfortunately, many of the words in question are likely to cause real offense to some readers, but we are convinced that an unflinching examination of defendant's speech is critical to a just analysis of his arguments. This Court has proceeded in this manner in similar situations in the past. See, e.g., State v. Grayhurst, 852 A.2d 491, 509 (R.I. 2004); Johnson v. Palange, 122 R.I. 361, 363 n. 2, 406 A.2d 360, 361 n. 2 (1979).

4    For reasons that will become apparent in the course of our discussion of defendant's arguments on appeal, it is significant to note that Trooper Washington has been described by both parties as an African-American man.

out of the cruiser. Trooper Washington stated that, upon alighting from his vehicle, he heard defendant say, "[T]ake me now, take me now, I don't care." Trooper Washington next testified that he asked defendant for identification and that defendant responded, "'[F]uck you, cops,' 'you're gay,' 'you * * * guys are queers,' [and] 'you guys are just harassing me.'" In addition, Trooper Washington testified that defendant made "several threats, threats saying he was going to kill us." Trooper Washington stated that, at that point in time, he was concerned for "[o]fficer safety and the female's safety," explaining that, when defendant began yelling and screaming, the troopers "didn't know what was going on."

Trooper Washington testified that defendant then "made a physical movement" towards both troopers and that Trooper Viera proceeded to place defendant in an "arm bar."[5] Trooper Washington added that, once defendant was placed in the arm bar, Trooper Washington proceeded to "grab" from defendant's pocket the identification which he had previously requested. Trooper Washington testified that, although the troopers "ended up calming [defendant] down for literally a brief second or two," while in the arm bar defendant kept on saying, "[Y]ou guys are harassing me" and, "I didn't do anything."

Trooper Washington next testified that, while he and Trooper Viera continued their attempts to calm defendant down, Trooper Viera "loosen[ed] the arm bar," at which point "it looked like [defendant] wanted to escape." Trooper Washington stated that "[f]rom that point forward, [he and Trooper Viera] ended up putting [defendant] in handcuffs for [their] safety."

---

[5]     On cross-examination, Trooper Washington explained that the term "arm bar" refers to a method of controlling an individual, whereby the individual's "arm is straight out" and the police officer is able to exert control over him. Trooper Washington testified that, in the just-described position, the officer has control over the individual, and the individual is bent over "against the cruiser * * * [to] have the vehicle support," thereby preventing him from moving around and injuring himself or others.

Trooper Washington later confirmed that, once defendant was in handcuffs, he was deemed to be under arrest for disorderly conduct.

Trooper Washington added that, during the process of handcuffing and immediately thereafter, defendant continued to yell: "'I'm going to kill you guys,' 'I don't care,' 'I don't care if I go back,' 'fuck you, cops,' 'you guys are queer,' 'gay,' [and] so forth." Trooper Washington further testified that he and Trooper Viera then decided to put defendant in their police cruiser; he described as follows what occurred while they were doing so:

> "[The defendant] literally looked at me and he said, '[Y]ou're nothing but a bitch-ass nigger,' 'I don't know why you're doing this,' 'you're going against me,' 'you're going against your own kind.' And that was directly toward me."

Trooper Washington further testified that he and Trooper Viera transported defendant to the Wickford barracks for processing; he added that defendant was uncooperative throughout the entirety of the troopers' attempt to process him at the barracks. Trooper Washington stated that defendant was "yelling, swearing, continuously stating that he knew people, that he was going to have my badge, that he was also going to kill me, kill Trooper Viera * * * [and was] calling us gay and saying we were harassing him."

On cross-examination, Trooper Washington testified that the two individuals whom he had observed in Middletown on the date at issue (viz., defendant and his female companion) were both African-American. Trooper Washington then answered a series of questions concerning the time at which defendant was placed in the arm bar by Trooper Viera. First, Trooper Washington admitted that, after he took defendant's identification, defendant was not released from the arm bar. Next, Trooper Washington testified that, after he obtained identification from defendant, Trooper Viera "release[d] the pressure" on defendant while defendant was in the arm bar; he added that, once they did so, "it seemed like [defendant] wanted

to continue at [him and Trooper Viera]."[6]  Finally, on further questioning, Trooper Washington stated that he felt as though defendant wanted to "continue at [him]" because, when Trooper Viera released the pressure on the arm bar, defendant "made a quick forward movement."  It was at that point, Trooper Washington testified, that the two troopers put defendant in handcuffs.  On redirect examination, Trooper Washington testified in more detail regarding defendant's forward movement, stating that Trooper Washington "[i]nterpreted that movement towards [the troopers], the forward movement [as meaning] that he was going to attack * * *."

Finally, Trooper Washington testified on cross-examination that, during the encounter with defendant, he understood defendant's utterances "as a threat."  Specifically, Trooper Washington testified that, "[w]hen a person says, 'I'm going to kill you,' I take that as a threat." He added that defendant said "I'm going to kill you" to both Trooper Viera and himself.

### 2. The Testimony of Trooper Edward Viera

Trooper Viera's testimony was largely consistent with the testimony of Trooper Washington regarding the night of defendant's arrest.  Trooper Viera testified that, in the early morning hours of January 31, 2012, he was riding as a passenger in the vehicle driven by Trooper Washington on West Main Road.  Trooper Viera stated that, at around 1:22 a.m., Trooper Washington pointed out two people, whom Trooper Viera later described as "standing in the street."  To Trooper Viera the pair appeared to be "engaged in a physical altercation;" he said that "[i]t appeared they had hold of each other's shirt in the front and were like moving around in a type of scuffle."  Trooper Viera testified that, as the troopers in the police car approached the pair, it appeared that the two individuals "were hugging."

---

[6]     On recross-examination, Trooper Washington noted that, although Trooper Viera "released the pressure," he did not release the arm bar; and Trooper Washington added that Trooper Viera still had physical control over defendant.

- 6 -

Trooper Viera next testified that the troopers proceeded to pull up to the two persons, and Trooper Viera observed that one of them was a man and the other was a woman. He next stated that he had "no sooner closed the door * * * when the * * * male party stepped back from the female and threw his hands in the air and demanded to be taken away."[7] When asked to describe what happened next, Trooper Viera testified that defendant was "screaming loud[ly] and boisterously, [in a] tumultuous manner, [a] violent manner." Trooper Viera specifically stated that defendant called both troopers "motherfuckers," told the two troopers that they "weren't shit," and told the troopers that they "couldn't do anything to him." It was at that time, Trooper Viera testified, that he put defendant in what he described as a "restraint." Trooper Viera stated that he "took [defendant] into control, forced him across the hood of the cruiser to get him to calm down and gained control of him." According to his testimony, Trooper Viera did so because he believed that "at [that] point [defendant] was in such an agitated state, he was either getting ready to run or fight;" the trooper added that his belief in that regard was "based on [his] training [and] experience."

Trooper Viera next testified that, after having been restrained by the troopers, defendant began calling the troopers "motherfuckers," "queers," and "fags;" he added that defendant then "threatened to kick [the troopers'] asses." In addition, Trooper Viera testified, defendant "threatened to kill [the troopers]." At that point, Trooper Viera testified, he had "heard enough, seen enough;" and he handcuffed defendant, placing him under arrest for disorderly conduct.

Trooper Viera's testimony then turned to the details of how he had first restrained and then arrested defendant. Trooper Viera confirmed that, when he placed defendant in the arm bar, he was not under arrest. Trooper Viera further testified that he tried to "de-escalate the

---

[7]    In the course of his testimony at trial, Trooper Viera identified defendant as the "male party" whom he observed at the time in question.

- 7 -

situation," telling defendant to "shut up" and "calm down," but he stated that it "didn't do any good." It was Trooper Viera's testimony that, after he released his grip "a little bit," defendant "continued to scream and move in a tumultuous and violent manner."

Trooper Viera next testified that, after defendant was placed in handcuffs and put into the back seat of the police cruiser, he "continued to scream and rant," including threatening the troopers. Trooper Viera's testimony in that regard was as follows: "[H]e just wouldn't shut up. He called us both niggers, threatened to kill both of us. Not only did he threaten[] to kill both of us, he threatened to kill our families too, just continually ranted." Trooper Viera further testified that he believed that the just-referenced utterances were directed at both Trooper Washington and himself because both troopers were in the car with defendant. Finally, Trooper Viera stated that he felt threatened and provoked by defendant at the time defendant was placed under arrest.[8]

On cross-examination, Trooper Viera testified that, at the beginning of his encounter with defendant, he walked towards defendant, who "took a step back." Trooper Viera characterized that step back as a "defensive posture" and a "defensive stance." Trooper Viera also stated that the "first thing [defendant] did was call[] [the troopers] motherfuckers[.]" After that, Trooper Viera testified, defendant said to the troopers that they could not "do shit" to him. Trooper Viera

---

[8]    The relevant exchange between the prosecutor and Trooper Viera proceeded as follows:

> "Q    * * * [I]f you could please tell us what [defendant] said to
>        you before you placed him in the arm bar?
> "A    * * * At the time I asked him for some identification, he
>        told me, 'come get it from me.' And it's at that point he
>        proceeded to call us motherfuckers, queers. It was at that
>        point that he was placed under arrest.
> "Q    Did you feel threatened?
> "A    Yes.
> "Q    Did you feel provoked?
> "A    Yes, I did."

conceded that it was at that point in time that he took "physical control" of defendant, before any threat to either trooper was made.

Trooper Viera also testified that, while in the police cruiser during transport, defendant "threatened to kick [the troopers'] asses." Trooper Viera added that defendant had accused Trooper Washington and himself of trying to take him into the woods and kill him and that, "before [defendant] would let [the troopers] do that, he would kill [them] first[.]" Finally, Trooper Viera acknowledged that, when defendant threatened the troopers' families, he did not indicate how he planned to carry out that threat.

**B**

**The Motion for a Judgment of Acquittal**

After Troopers Washington and Viera testified, the state rested. Defense counsel then moved for a judgment of acquittal pursuant to Rule 29(a) of the Superior Court Rules of Criminal Procedure, arguing that defendant's speech was not "likely to [have] produce[d] a clear and present danger of serious, substantial evil that rises far above public inconvenience[,] annoyance or unrest." Relying upon State v. McKenna, 415 A.2d 729 (R.I. 1980), and State v. Authelet, 120 R.I. 42, 385 A.2d 642 (1978), defense counsel contended: (1) that defendant's "verbal barrage" constituted no more than "idle, wild threats," as was held to have been the case in McKenna; and (2) that defendant's speech was not directed at an individual, as required by Authelet. The state objected to the motion; in particular, the state attempted to distinguish McKenna on its facts, referring to the defendant in that case as a "young girl" and emphasizing her apparent inability to "effectuate [her] threat."

The trial justice denied defense counsel's motion for a judgment of acquittal. He began by reading the relevant statute, § 11-45-1(a)(3), into the record and pointing to the elements that

- 9 -

must be proven in order to convict a person of the "fighting words" form of disorderly conduct; he quoted § 11-45-1(a)(3) in stating that "[a] person commits disorderly conduct if he or she intentionally, knowingly or recklessly * * * [d]irects at another person in a public place offensive words which are likely to provoke a violent reaction on the part of the average person so addressed." Focusing on these criteria, the trial justice ruled that the case could be submitted to the jury.[9] He found that there was sufficient evidence such that a reasonable juror could find: (1) that defendant "acted intentionally;" (2) that defendant directed the words in question, beginning with "[A]rrest me" and "[T]ake me away," at Trooper Washington and Trooper Viera; (3) that defendant spoke the words in a public place "during the course of [the] confrontation;" and (4) that the words spoken by defendant "could be looked at in the light that their very utterance inflicted injury or tend[ed] to incite an immediate breach of the peace." On the basis of these findings, the trial justice denied the motion for a judgment of acquittal, and the defense then rested without presenting any evidence.

---

[9] In ruling on defense counsel's motion, the trial justice conflated the "fighting words" subsection of the disorderly conduct statute, § 11-45-1(a)(3), with the subsection addressing behavior, § 11-45-1(a)(1). Significantly, however, the trial justice did recite the correct standard under the § 11-45-1 (a)(3), or "fighting words" provision.

The just-referenced issue occurred a few more times during the travel of this case in Superior Court; in one instance, the trial justice mistakenly referenced the "behavior" subsection during the instructions to the jury, but still gave the correct elements to the "fighting words" subsection of the disorderly conduct statute. In another instance, while ruling on defendant's motion for a new trial, the trial justice erroneously referred to the "specific written" charge applicable to defendant as the "behavior" subsection of the disorderly conduct statute. Once again, however, he correctly described the "fighting words" concept as he continued to rule on the motion. At each juncture, however, defendant failed to object to any statement by the trial justice incorrectly referencing the "behavior" subsection of the disorderly conduct statute.

## C

## The Jury Instructions and the Verdict

Following final arguments by the parties, the trial justice instructed the jury. Neither party raised any objections to the instructions. In fact, the trial justice later stated, in ruling on defendant's motion for a new trial, that he had charged the jury "essentially in accord with the proposed jury instructions from the defendant."

The jury proceeded to deliberate, and a guilty verdict resulted. Shortly thereafter, defendant moved for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure.

## D

## The Motion for a New Trial

On July 5, 2012, the trial justice conducted a hearing on defendant's motion for a new trial. In his written submission, defendant contended that the evidence was insufficient to support the verdict and that the trial justice had committed an error of law in denying defendant's motion for a judgment of acquittal pursuant to Rule 29.[10] At the hearing, defendant developed those arguments more fully; he contended that, under both Rhode Island and United States Supreme Court precedent, defendant's speech simply did not constitute fighting words. More

---

[10] To the extent that defendant moved for a new trial on grounds that the evidence was insufficient to support the verdict, such that a different standard of review may apply, see State v. Karngar, 29 A.3d 1232, 1235 (R.I. 2011); State v. Clark, 974 A.2d 558, 569 (R.I. 2009), we note that our decision in the instant case, discussed infra, ultimately forecloses any question regarding sufficiency of the evidence. We make this determination in light of the following: (1) defendant utilized the "weight of the evidence" standard of review in his brief, thereby waiving any argument on appeal regarding the sufficiency of the evidence standard in the context of a motion for a new trial; and (2) to the extent any sufficiency challenge was raised, our conclusions with respect to defendant's motion for a new trial and motion for a judgment of acquittal yield the same result when applied to a motion for a new trial based upon the sufficiency of the evidence. See Karngar, 29 A.3d at 1235; Clark, 974 A.2d at 569.

specifically, defendant relied upon the previously referenced <u>McKenna</u> and <u>Authelet</u> cases in support of his argument that the words spoken on January 31, 2012 were no more than "unspecific, idle" and "conditional" threats. In opposition to defendant's motion, the state characterized defendant's contentions in his motion for a new trial as "factual argument[s]," and the state added that the jury had already heard "more than sufficient evidence" to convict defendant.

After hearing from both parties, the trial justice denied defendant's motion for a new trial. He began by focusing on the charge itself, carefully reviewing in detail the elements contained in the "fighting words" statute, § 11-45-1(a)(3). The trial justice next reviewed the facts as they unfolded at trial, and he then identified the issue before him as "whether the speech, as testified to credibly by the troopers, rose to the level of [the] criminal offense with which [defendant] was charged." He concluded that the words were fighting words, that they "certainly rose above idle threats and thoughtless, toothless warnings," and that "the credible evidence constituted proof beyond a reasonable doubt of each of the elements of the offense of disorderly conduct * * *." The defendant timely appealed.

## II

### Analysis

We have often noted that "a defendant has a higher hurdle to overcome when arguing a Rule 29 motion for judgment of acquittal than when he seeks to prevail on a Rule 33 motion for [a] new trial * * *." <u>State v. Fleck</u>, 81 A.3d 1129, 1133 (R.I. 2014); <u>see</u> <u>also</u> <u>State v. Musterd</u>, 56 A.3d 931, 940-41 (R.I. 2012). Our case law is clear as to why the criteria applicable to these two rules are so different. We have stated that, when a trial justice reviews an acquittal motion, he or she "must view the evidence in the light most favorable to the state, * * * giving full credibility

to the state's witnesses, and draw[ing] therefrom all reasonable inferences consistent with guilt." Fleck, 81 A.3d at 1133 (internal quotation marks omitted). In contrast, we have indicated that, in "the case of a motion for [a] new trial, * * * the trial justice does not favor the state's evidence, but use[s] independent judgment to weigh the evidence and assess the credibility of the witnesses." Id. (internal quotation marks omitted). In other words, "the burden is less onerous under the standard applicable to a motion for [a] new trial because the trial justice is permitted to weigh conflicting evidence." State v. Richardson, 47 A.3d 305, 317 (R.I. 2012). It should also be recalled that "[t]he motion for a new trial requires a more exacting analysis[;] * * * therefore, unless a defendant can show that the presented evidence failed to support his or her conviction upon the motion-for-a-new-trial standard, a defendant necessarily will be unable to establish he or she was entitled to a judgment of acquittal." Id. (internal quotation marks omitted).

Accordingly, we shall begin our analysis by reviewing the motion for a new trial. Id. at 317 ("When faced with a defendant's challenge to the rulings on both motions * * * this Court first conducts a review of the new-trial motion.") (internal quotation marks omitted). Bearing in mind the appropriate sequence, we turn to the substance of defendant's arguments on appeal.

**A**

**The Motion for a New Trial**

**1. Standard of Review**

When addressing a motion for a new trial, the trial justice places himself or herself in the role of a "thirteenth juror" and then exercises his or her independent judgment as to the credibility of the witnesses and the weight of the evidence. State v. Stansell, 909 A.2d 505, 511 (R.I. 2006); see also State v. Buchanan, 81 A.3d 1119, 1127 (R.I. 2014). In our recent decision

in State v. Hie, 93 A.3d 963 (R.I. 2014), we summarized in a numbered format how the trial justice, acting as the "thirteenth juror," should proceed:

> "In fulfilling his or her role as the thirteenth juror and passing on a motion for a new trial, the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury. * * * If, after carrying out this three-step analytical process, the trial justice agrees with the jury's verdict or determines that reasonable minds could differ, then the analysis is complete and the verdict should be affirmed. * * * However, if the trial justice does not agree with the verdict or does not agree that reasonable minds could differ, then the trial justice must determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." Id. at 974-75 (internal quotation marks omitted).

When this Court is called upon to review a trial justice's decision on such a motion, "we accord great weight to a trial justice's ruling * * * if he or she has articulated sufficient reasoning in support of the ruling." State v. Silva, 84 A.3d 411, 417 (R.I. 2014) (internal quotation marks omitted). Notably, while "the record should reflect a few sentences of the justice's reasoning on each point[,] * * * [t]he trial justice need not refer to all the evidence supporting the decision; rather, he or she need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." State v. Robat, 49 A.3d 58, 71 (R.I. 2012) (emphasis in original) (internal quotation marks omitted).

Finally, it is well established that, "unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case," we will not overturn the trial justice's determination. Id. (internal quotation marks omitted); see also State v. Texieira, 944 A.2d 132, 141 (R.I. 2008).

- 14 -

## 2. Discussion

On appeal, defendant argues that the trial justice erred in denying his motion for a new trial. The defendant contends that his utterances early in the morning of January 31, 2012 did not rise to the level of "fighting words," but rather constituted protected speech under the First Amendment. In responding to that contention, the state argues that defendant's speech is distinguishable from the speech that our cases have held to be constitutionally protected and that, in the context in which they were uttered in this case, defendant's words did in fact constitute fighting words. We begin with a brief review of the pertinent First Amendment jurisprudence.

### i. First Amendment Principles

This Court has long recognized that the "First Amendment [to the United States Constitution] applies to the states through the Fourteenth Amendment;" and we have further recognized that, in light of the textual protections for the freedom of speech in the First Amendment, there are limitations on what types of speech may be proscribed by the state. Clift v. Narragansett Television L.P., 688 A.2d 805, 810 (R.I. 1996). In fact, we have expressly stated that "only speech falling into certain specifically defined areas [can] be controlled." Id. And we have indicated that, "[t]hose controllable areas include[] obscenity, fighting words, defamatory invasions of privacy, and words likely to produce imminent lawless action (incitement)."[11] Id. We have developed our jurisprudence concerning the "controllable" area of speech that is at issue in the instant case—fighting words—in conformity with the decisions of the United States Supreme Court. Id.; see Authelet, 120 R.I. at 52-57, 385 A.2d at 647-50. The seminal United

---

[11] See also Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. * * * These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.").

States Supreme Court case addressing fighting words is <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568 (1942), in which the Supreme Court defined fighting words as "those [words] which by their very utterance inflict injury or tend to incite an immediate breach of the peace." <u>Id.</u> at 572; <u>see also</u> <u>McKenna</u>, 415 A.2d at 731 (utilizing the <u>Chaplinsky</u> approach); <u>Authelet</u>, 120 R.I. at 56, 57; 385 A.2d at 649 (same).

We have conformed our definition of fighting words to comport with evolving United States Supreme Court precedent, acknowledging that such speech, in order to fall beyond the pale of First Amendment protection, must "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." <u>Authelet</u>, 120 R.I. at 53, 385 A.2d at 648 (quoting <u>Gooding v. Wilson</u>, 405 U.S. 518, 524 (1972)). Our adherence to the just-referenced principles has shaped our fighting words precedent; and three cases in particular (two of which we have already mentioned) illuminate the various guidelines which this Court has used for the purpose of determining whether speech constitutes unprotected fighting words: <u>McKenna</u>, 415 A.2d at 731-32; <u>Johnson v. Palange</u>, 122 R.I. 361, 370, 406 A.2d 360, 365 (1979); and <u>Authelet</u>, 120 R.I. at 48-57, 385 A.2d at 645-50.

We turn first to <u>Authelet</u>, in which the defendant was convicted of "profane swearing and cursing" as a result of an incident at a party which was broken up by police officers. <u>Authelet</u>, 120 R.I. at 44-45, 385 A.2d at 643 (internal quotation marks omitted). At the defendant's bench trial, a police officer who had been present at the scene testified that the defendant yelled, "Here come the god damn fucking pigs again," when officers approached the defendant and his companions outside of a store. <u>Id.</u> at 44, 385 A.2d at 643. Based upon the officer's testimony, the trial justice found the defendant guilty of violating the statute prohibiting "profane swearing and cursing." <u>Id.</u> (internal quotation marks omitted).

On appeal, Authelet argued, inter alia, that the statute encroached on his First Amendment right to freedom of speech. Id. at 45, 385 A.2d at 643. The state responded that the statute could be construed more narrowly so as to render it constitutional; and this Court agreed, construing the statute as being applicable only to "fighting words," just as the United States Supreme Court had construed the relevant New Hampshire statute in Chaplinsky, 315 U.S. at 574. Authelet, 120 R.I. at 51, 52, 57-58, 385 A.2d at 647, 650.

After this Court in Authelet engaged in an in-depth discussion of the evolution of the "fighting words" concept in the jurisprudence of the United States Supreme Court, it set forth the following objective test as to whether particular speech constitutes "fighting words":

> "The test to be applied when the prosecution relies on the fighting words theory is an objective one: Are the defendant's expressions words which, when directed to the average person, would cause the addressee to fight? * * * It is not necessary that the person who is personally insulted react violently. As long as the language is inherently likely to cause an average person to retaliate in a violent way, the defendant's words may be punished as fighting words. Thus, * * * even though a police officer may be expected not to react to abusive language, words directed to an officer which would cause an average person to fight may be proscribed."
> Authelet, 120 R.I. at 57, 385 A.2d at 649-50.

In addition, this Court acknowledged the admonition of the United States Supreme Court that "[f]ighting words are recognized as having some social value and are not to be punished on a 'per se' basis but only when their use results in the likelihood of an imminent disturbance." Id. at 55, 385 A.2d at 649 (emphasis added). In other words, the context in which words are uttered must always be the focus of our analysis.

On the basis of the just-summarized principles, we held that the speech of the defendant Michael Authelet did not, as a matter of law, constitute "fighting words." Id. at 42, 57, 385 A.2d at 642, 650. Our rationale for that holding was simple: under the above-referenced test,

"absolutely no evidence exist[ed] to suggest that the message was directed at [the arresting officer]." Id. at 58, 385 A.2d at 650.

We next turn to the Johnson opinion, wherein we discussed fighting words in the context of a civil case involving claims of malicious prosecution and false imprisonment. Johnson, 122 R.I. at 363-72, 406 A.2d at 361-66. The underlying facts in Johnson related to an earlier criminal case: the five plaintiffs had been charged with violation of a local disorderly conduct ordinance as a result of their having engaged in a shouting match with police officers who had accused them of loitering outside of an establishment known as Parrot North Cafe. Id. at 363-64, 406 A.2d at 361-62. Several epithets were shouted at the officers, including "fucking asshole," "fucking pig," and "(d)umb son of a bitch." Id. at 363 n. 2, 406 A.2d at 361 n. 2. In passing upon these words, we stated that fighting words "have been defined as those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." Id. at 370, 406 A.2d at 365 (internal quotation marks omitted). And we specifically noted that "[s]uch words, even when addressed to a police officer, do not lose their character as fighting words, if, under the objective test that we apply, they would cause an average person to fight." Id. at 370-71, 406 A.2d at 365 (emphasis added) (internal quotation marks omitted). However, noting that it was not necessary to decide the issue, we declined to rule definitively on the question of whether or not the "verbal insults" in question, which had been shouted at the police officers in the circumstances described in Johnson, "were in fact fighting words."[12] Id. at 371, 406 A.2d at 365.

---

[12] We pause to note that this Court has never adopted the principle espoused by Justice Powell in his concurring opinion in Lewis v. City of New Orleans, 415 U.S. 130, 135 (1974), in which he stated that: "[A] properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words." (Internal quotation marks omitted.) Instead, it is the rule in this jurisdiction

Finally, we turn to McKenna, in which we held that the speech of the defendant Joanne McKenna did not constitute fighting words because "on the facts presented * * * her words [did not] create[] an inherent likelihood of provoking an imminent retaliation." McKenna, 415 A.2d at 731. The facts in that case, as they unfolded during a bench trial through the testimony of two police officers, were as follows. Id. at 730. One officer testified that the underlying events began after he responded to a radio call regarding three juveniles standing on a roof and throwing rocks down at pedestrians and cars. Id. The officer added that, while he and another officer took the juveniles into custody, the defendant, who was in a "nearby parking lot," "became verbally abusive" to the officers, including threatening to "'blow [their] fucking heads off.'" Id. The same officer stated that the defendant also "disobeyed another officer's order to be quiet and to leave the area" and, instead, "continued to berate all of the policemen." Id. The officer added that the defendant "did not direct her statement to him personally," but rather to the officers "as a group." Id. Finally, he testified that, during the incident, the defendant "moved toward the group of officers." Id. A second officer testified that, "at the time [the] defendant uttered the threat[,] she was standing in the road some fifteen feet from him;" in addition, he stated that she "called the group of police 'cocksuckers.'" Id.

After the officers testified at the jury-waived trial, the trial justice found the defendant guilty of violating the pertinent disorderly conduct ordinance and sentenced her to pay a $10 fine. McKenna, 415 A.2d at 730. On appeal, the defendant argued that the ordinance, as applied to her conduct, was unconstitutional; in her view, "the First Amendment for[bade] the state from punishing her for speaking the words" because the words were not otherwise proscribed as an

that abusive words, "even when addressed to a police officer, do not lose their character as fighting words, if, under the objective test that we apply, they would cause an average person to fight." Johnson, 122 R.I. at 370-71, 406 A.2d at 365 (emphasis added) (internal quotation marks omitted).

exception to First Amendment protection—i.e., the words were not "fighting words." Id. Notably, in McKenna, the state conceded that, if the ordinance prohibited only "fighting words," then the defendant was not in violation of the ordinance. Id.[13]

Although the state's concession rendered unnecessary a ruling on the question of whether the defendant's utterances constituted fighting words, this Court clearly deemed it worthwhile to explicate in some detail the "fighting words" concept; we ultimately concluded that "[i]n light of the attendant circumstances," the defendant's speech had not constituted "fighting words." Id. at 731. We considered the following factors in reaching our conclusion in that regard: (1) the fact that the defendant addressed her remarks to a group of five persons and that "[s]he spoke to [the officers] as a group, not individually nor face-to-face;" (2) the fact that "[s]he was standing some fifteen feet away when she delivered her insults;" and (3) the fact that "the remarks apparently did not concern the officers individually."[14] Id. Accordingly, we reversed the conviction of the defendant McKenna for disorderly conduct, holding that her speech did not constitute fighting words, nor did it constitute incitement. Id. at 731, 732.

With the foregoing principles and cases in mind, we turn now to the specific facts upon which the instant appeal must turn.

---

[13]     As an alternative to its "fighting words" argument, the state contended that the defendant's language could have fallen within what constituted another category of proscribed speech; the state argued that the defendant's threatening language, combined with her movement towards some of the officers, evidenced an intent to incite others to violence against the police and a likelihood that her words would cause others to become violent. State v. McKenna, 415 A.2d 729, 730-31 (R.I. 1980). This Court rejected the argument that the defendant's speech constituted incitement, noting that the defendant "did not exhort anyone else to take action against the officers." Id. at 732. We characterized her words as an "idle threat" and "a thoughtless and toothless warning uttered in the midst of an emotional harangue." Id.

[14]     We based our conclusion that the words uttered by the defendant McKenna "apparently did not concern the officers individually" on the fact that the reaction of the officers to those words was "merely" to tell her "to be quiet." McKenna, 415 A.2d at 731.

## ii. Application to the Instant Case

We begin by scrutinizing the trial justice's assessment of defendant's motion for a new trial, in which he attacked the weight of the evidence presented at the trial in which he was convicted. See footnote 10, supra. It is clear to us that the trial justice conducted that assessment in strict compliance with the methodological approach that has been repeatedly endorsed by this Court. See, e.g., Hie, 93 A.3d at 974-75; see also Silva, 84 A.3d at 416-17; Robat, 49 A.3d at 71.

First, the trial justice "considered the evidence in light of the jury charge" by reviewing first his own instructions to the jury in detail and then summarizing the testimony given at trial. Hie, 93 A.3d at 976. In accordance with the analytical approach endorsed in Hie, the trial justice "considered the testimony of every witness who testified at trial." Id. And, significantly, he did so in light of the jury charge on disorderly conduct, addressing specifically the elements required to show that defendant's speech constituted unprotected fighting words. He read verbatim from defendant's request for jury instructions and then proceeded to review the evidence in light of that charge.

In compliance with the second step of the analytical process, the trial justice next independently reviewed the evidence and, in the process, expressly addressed the credibility of the witnesses. See Hie, 93 A.3d at 976. The trial justice discussed the testimony of Trooper Washington and Trooper Viera, and bluntly stated: "Obviously, the jury found the officers to be credible and so do I." He specifically characterized defendant's utterances as having been "testified to credibly by the troopers." The trial justice then proceeded to apply to the evidence (i.e., what the troopers had testified to) the four elements of a "fighting words" violation as set forth in the jury charge—viz., (1) that defendant acted intentionally, knowingly, or recklessly when he uttered the words in question; (2) that defendant directed those words at a specific

- 21 -

individual; (3) that defendant spoke the words in a public place; and (4) that defendant used words that, by their very utterance, inflicted injury or tended to incite an immediate breach of the peace.  See § 11-45-1(a)(3).

The trial justice first found that defendant "acted intentionally, knowingly or recklessly when he said the words that the troopers testified to," in light of the fact that defendant continued to "verbal[ly] barrage" the troopers after they asked him to calm down.  Second, the trial justice found that the "credible evidence" indicated that defendant directed his speech at the two troopers.  Third, he concluded that the evidence indicated that defendant had uttered the words in a public place—specifically, "the corner of Smith Street and West Main Road in Middletown * * *."  Fourth, and finally, the trial justice found that the words spoken by defendant, "by their very utterance[,] inflict[ed] injury or tend[ed] to incite an immediate breach of the peace;" the trial justice stated that defendant was "[e]ssentially * * * inciting the troopers to engage in a physical [response] -- or trying to incite them to a physical response."  In sum, the trial justice reviewed the evidence and found credible testimony supporting each element of what the state had borne the burden of proof of showing—viz., that defendant had engaged in disorderly conduct by uttering words that, in the circumstances testified to at trial, fell outside the protections of the First Amendment.

In the third and final step of the requisite analysis, it was implicit in the trial justice's analysis that he agreed with the jury's verdict.  Under our precedent, the trial justice's agreement with the jury in the instant case rendered his analysis complete.  See Hie, 93 A.3d at 977 ("[I]t is clear that, after properly assessing the evidence and weighing the credibility of the witnesses, the trial justice concluded that he could not disagree with the [jury's] verdict.  As such, his analysis

- 22 -

[was] complete, and he denied defendant's motion for a new trial.") (internal quotation marks omitted).

While our meticulous review of the reasoning of the trial justice on each of the pertinent analytical steps has persuaded us to affirm the trial justice's denial of defendant's motion for a new trial, we pause to briefly address defendant's contention that his conviction should be reversed on the basis of the reasoning contained in McKenna—i.e., that, in contrast to the trial justice's conclusion, defendant's speech was protected and did not constitute fighting words because it did not "inflict injury or tend to incite an immediate breach of the peace." Chaplinsky, 315 U.S. at 572. More specifically, defendant contends that his threats were no more abusive than the language employed by the defendant in McKenna, who threatened to blow the heads off nearby police officers.

We reject defendant's contention. It is important to bear in mind the principle to which we have already alluded to the effect that there are no per se fighting words. See Authelet, 120 R.I. at 55, 385 A.2d at 649 ("Fighting words are recognized as having some social value and are not to be punished on a 'per se' basis but only when their use results in the likelihood of an imminent disturbance.") (emphasis added). Accordingly, the linguistic similarity between the words uttered by the defendant in McKenna and by defendant in this case does not dispose of the question of whether this defendant's speech constituted fighting words. Instead, we must look to the context[15] of defendant's speech, as we did in McKenna, assessing the "attendant

---

[15] Indeed, it is a virtual truism that all language is understandable only in context. See, e.g., Deal v. United States, 508 U.S. 129, 132 (1993) (referring to a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used"); Leach v. Federal Deposit Insurance Corp., 860 F.2d 1266, 1270 (5th Cir. 1988) ("It is only * * * within a context that a word, any word, can communicate an idea."); cf. State v. Sivo, 809 A.2d 481, 488

circumstances" to determine whether defendant's utterances fell outside the protection afforded by the First Amendment. McKenna, 415 A.2d at 731.

Initially, we note that, in the present case, the state made no concessions regarding the language used by defendant, and instead maintained from the outset that his speech constituted fighting words. By contrast, in McKenna, 415 A.2d at 730, the state conceded that the defendant's speech did not violate the ordinance—that is, the state acknowledged that the defendant's speech did not constitute fighting words. As a result, this Court's subsequent discussion of whether the defendant's speech in McKenna constituted fighting words was not required for the purpose of resolving the case before it.

Next, and more critical to our present analysis, McKenna is distinguishable from the instant case in view of the precise factors which this Court found relevant to its "fighting words" analysis in that earlier case. First, in the present case, defendant addressed his remarks to two officers, rather than to a group of five persons. McKenna, 415 A.2d at 731. This Court in McKenna went out of its way to state that the defendant in that case "spoke to [the police officers] as a group, not individually nor face-to-face." Id. By contrast, in this case, the trial justice specifically found that defendant directed his words at Trooper Washington and Trooper Viera, stating that "[t]he credible evidence was that [Mr. Matthews] directed those words at the two troopers, not a group of individuals." In addition, both troopers testified repeatedly that defendant had spoken directly to them.

Second, Mr. Matthews was in closer proximity to the troopers than the defendant was to the officers in McKenna. Specifically, in McKenna, 415 A.2d at 731, the defendant was "some fifteen feet away" from the officers at all relevant times, and that distance was one of the factors

_____

(R.I. 2002) (stating that this Court reviews the challenged portion of a jury charge "in the context in which it was delivered").

- 24 -

cited by this Court as relevant to its determination that the defendant's speech did not constitute fighting words. By contrast, in the instant case, defendant was in the troopers' immediate physical proximity while in an arm bar over the hood of a cruiser.

Third, there was testimony in this case that the words spoken by defendant did concern and alarm the officers individually.[16] Trooper Viera testified that he felt both threatened and provoked by Mr. Matthews's speech, and Trooper Washington testified that he took Mr. Matthews's speech "as a threat." Again, this evidence stands in stark contrast to the facts in McKenna, in which the defendant's remarks "apparently did not concern the officers individually," and this Court expressly opined that the officers "were more annoyed with [the defendant] than moved to violent retaliation." McKenna, 415 A.2d at 731.

Although our application to this case of the just-referenced considerations that were discussed by this Court in McKenna is important to our determination that the instant defendant's speech constituted fighting words, we believe that a fourth consideration even more convincingly militates in favor of holding that defendant's speech fell outside the realm of protected First Amendment speech. In McKenna, 415 A.2d at 730, the defendant was quite clearly a bystander; she stood yards away from the police officers as they attempted to arrest several juveniles for what appeared to be delinquent activity. The defendant in McKenna

---

[16] While the test to be applied to defendant's utterances in this case is an objective one, see Authelet, 120 R.I. at 57, 385 A.2d at 649, we note that we are not thereby barred from considering the reactions of Troopers Washington and Viera as evidence of the reaction of an average person to the utterances made by defendant. See Grayhurst, 852 A.2d at 514-15 n. 11 (contrasting the defendant's actions with those of the defendant in McKenna, and noting the addressee's lack of alarm in the former case as evidence that the McKenna defendant's utterances did not constitute "fighting words"); see also State v. Allcock, 857 A.2d 287, 289 (Vt. 2004) (discussing the defendant's utterances and noting that "[t]here was also evidence that [the] defendant's behavior alarmed other patrons * * * to the point where they felt compelled to leave. The evidence was thus sufficient to support a finding that an average person, in these circumstances, could have felt provoked to a violent reaction.").

interrupted and irritated the officers who were attempting to do their job; and, although she shouted some threatening words at them, she was not the reason for their initial decision to come to the scene or their subsequent decision to arrest certain juveniles. Id. at 730-31.

We deem defendant's role in the specific circumstances of the case before us to be an especially important factor that militates powerfully in favor of the trial justice's conclusion that defendant's utterances constituted unprotected fighting words. In the instant case, defendant himself was directly and personally involved in the very incident that prompted the troopers to execute a U-turn, stop their cruiser, and make inquiries of two individuals who appeared to be involved in an altercation while standing in a public place. The defendant refused to provide his identification to the troopers, and he immediately escalated what could have been a routine inquiry into a threatening situation. The defendant was not a bystander, nor was he uninvolved in the troopers' immediate purpose in coming to the scene. In sum, Troopers Washington and Viera were present at the West Main Road location on the night in question specifically in order to assess what was transpiring between defendant and the female with whom he appeared to have been engaged in some sort of altercation. The defendant's decision at that juncture to shout threats, abusive language, and provocative utterances—in particular, his reaction to the troopers' request for identification by challenging the troopers to "come and get it from me"—is what distinguishes the instant case from the "attendant circumstances" in McKenna, 415 A.2d at 731.[17]

---

[17] We would add that the situation in Authelet may be readily contrasted with what was involved in the instant case. Both troopers in this case testified that defendant's words were directed at them, and the trial justice explicitly credited their testimony. By contrast, in Authelet, there was a complete lack of any testimony indicating to whom the alleged "fighting words" were directed. Authelet, 120 R.I. at 58, 385 A.2d at 650. Accordingly, we also find Authelet readily distinguishable from the instant case.

For the foregoing reasons, we do not hesitate to affirm the trial justice's denial of defendant's motion for a new trial.

**B**

**The Motion for a Judgment of Acquittal**

Because we hold that defendant could not clear the necessary hurdle for us to reverse the trial justice's denial of his motion for a new trial, we need not address his appeal from the trial justice's ruling on the motion for a judgment of acquittal. See Richardson, 47 A.3d at 317. Suffice it to say that, for the reasons elucidated in the foregoing portion of our analysis, we affirm the trial justice's decision in that regard. See State v. Pineda, 13 A.3d 623, 642 (R.I. 2011).

**C**

**The Alleged Insufficiency of the Criminal Complaint**

We turn next to the defendant's claim on appeal that the criminal complaint lodged against him was insufficient as a matter of law to place him on notice of the charge against him because the complaint, on its face, made conflicting references to different subsections of the statute under which he was charged. However, in accordance with settled principles of appellate jurisprudence, we need not address the substance of this claim because the defendant completely failed to raise the issue before the trial court. We have long held that, if "an argument [i]s not raised at any point before the trial court, it has not been preserved for appellate review." State v. Garrett, 91 A.3d 793, 804 n. 8 (R.I. 2014); see also State v. Figuereo, 31 A.3d 1283, 1289 & n. 6 (R.I. 2011) (citing cases). The defendant never objected to the contents of the complaint—not in

a motion filed before trial and not during the trial itself.[18]  It is further worth recalling that the trial justice stated that he had charged the jury "essentially in accord with the proposed jury instructions from the defendant;" accordingly, we are persuaded that the defendant received sufficient notice of the charge against him in view of the fact that he was able to provide the jury with what he considered to be appropriate instructions as to the applicable law in this case. Accordingly, the issue was not properly preserved for our review.

## III

### Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction and its denial of the defendant's motion for a new trial and motion for a judgment of acquittal.  The record in this case may be returned to that tribunal.

---

[18]  We note that defendant also failed to object at trial to a single instance in which the trial justice referred to the behavior subsection of the disorderly conduct statute rather than its fighting words provision.



**TITLE OF CASE:**        State v. Thomas H. Matthews.

**CASE NO:**        No. 2012-299-C.A.
                              (N3/12-105A)

**COURT:**        Supreme Court

**DATE OPINION FILED:**   April 2, 2015

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**    Newport County Superior Court

**JUDGE FROM LOWER COURT**:

                              Associate Justice Stephen P. Nugent

**ATTORNEYS ON APPEAL:**

                              For State:  David T. Bonzagni
                                        Department of Attorney General

                              For Defendant:  Kara J. Maguire
                                        Office of the Public Defender